# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE TAX LIABILITIES OF:<br><br>JOHN DOES, United States taxpayers who, at any time during the years ended December 31, 2014, through December 31, 2023, used the services of the Trident Trust Group, including its predecessors, subsidiaries, divisions, affiliates, and associates to establish, maintain, operate, or control any foreign financial account or other foreign asset; any foreign corporation, company, trust, foundation or other legal entity; or any foreign or domestic financial account or other asset in the name of such foreign entity. | Case No. |

## DECLARATION OF RANDY HOOCZKO

# TABLE OF CONTENTS

I.    Introduction......................................................................................1

II.   The Current Investigation .................................................................3

III.  Background on Offshore Tax Evasion and IRS Compliance Initiatives.........6

A.   Internal Revenue Laws Require U.S. Persons to Report Income Earned Worldwide and to Disclose All Foreign Financial Accounts.........................7

B.   Prior IRS Compliance Initiatives Have Revealed Common Indicators of Abusive Offshore Arrangements ....................................................11

  i.    Offshore Accounts and Entities .............................................16

  ii.   Offshore Service Providers as Intermediaries..........................16

  iii.  Use of Nominees and Provision of Entity Officers ...................17

  iv.   Bearer Share Corporations ...................................................18

  v.    Use of Intermediary Addresses and Mail Forwarding Services ................20

  vi.   Private Banking and Client Services........................................20

  vii.  Combining Common Features for Increased Complexity and Secrecy .....22

C.   Financial Tools Used to Move Money Internationally ...............................25

  i.    Use of Correspondent Banking Accounts..................................26

  ii.   Wire Transfer as Means to Move Money ...................................28

IV.   The TT-Group.................................................................................29

A.   Corporate Structure...........................................................................30

  i.    TT (USA) Holdings, Inc., Trident Corporate Services, Inc., and Trident Fund Services, Inc.........................................................31

  ii.   Trident Trust Company (South Dakota) Inc. and Trident Corporate Services (USA) LLC..............................................33

  iii.  Global Entities..................................................................34

  iv.   TT-Group Affiliate: Nevis Services Ltd. ..................................34

B.   Services Offered by the TT-Group Bear the Hallmarks of Abusive Offshore Arrangements..............................................................35

  i.    Offshore Accounts and Entities ..............................................36

  ii.   Offshore Service Providers as Intermediaries...........................39

  iii.  Use of Nominees and Provision of Entity Officers ...................44

iv. Bearer-Share Corporations.....................................................................45

v. Use of Intermediary Addresses and Mail-Forwarding Services................46

vi. Private Banking and Client Services.......................................................48

vii. General Focus on Secrecy and Concealment...........................................49

viii.........Use of Correspondent Banking Accounts and Wire Transfers to Move Money ........................................................................................................55

C. The IRS Has Specific Examples of Tax Non-Compliance by TT-Group Clients ............................................................................................................58

i. Examples from the Voluntary Disclosure Programs ..................................59

ii. Examples from the Streamlined Filing Compliance Procedures Program .74

V. The Requirements for a John Doe Summons Are Met for Each Summonsed Entity 77

A. The Summonses Describe a Particular Person or Ascertainable Class of Persons ............................................................................................................78

B. The Internal Revenue Service Has Reason to Believe Members of the John Doe Class May Have Failed to Comply with the Internal Revenue Laws....79

C. The Requested Information Is Not Readily Available from Other Sources .82

D. The Information Sought from Each Summonsed Entity Is Narrowly Tailored 83

i. Identity Information ...................................................................................84

ii. Transaction Information.............................................................................87

iii. Beneficial Ownership Information ...........................................................88

E. Each Proposed Summons Recipient Is Likely to Have Information Responsive to the Narrowly Tailored Requests ............................................90

VI. Conclusion ......................................................................................................100

Appendix A: Summary of TT-Group foreign Entities ..........................................103

I, Randy Hooczko, pursuant to 28 U.S.C. § 1746, declare and state:

## I.  Introduction

1.      I am a duly commissioned Internal Revenue Agent ("Revenue Agent") assigned as a Senior Revenue Agent in the Offshore Compliance Initiatives Program of the Internal Revenue Service ("IRS"). The Offshore Compliance Initiatives Program finds ways to identify U.S. taxpayers who try to use offshore transactions and arrangements to unlawfully evade U.S. tax reporting and payment requirements ("abusive offshore arrangements"). I have been a Revenue Agent since 1985 and have specialized in offshore investigations since 2002. I have been with the Offshore Compliance Initiatives Program since February 2011. Before that, for about one year, I was assigned as a Technical Advisor to assist agents reviewing Offshore Voluntary Disclosure submissions.

2.      As a Senior Revenue Agent in the Offshore Compliance Initiatives Program, I have been assigned to work on the IRS's Offshore Private Banking and Offshore Merchant Account initiatives. These initiatives work to combat the use of offshore bank and merchant accounts by U.S. taxpayers who use them to unlawfully avoid paying U.S. taxes. I have assisted on matters involving the Foreign Account Tax Compliance Act ("FATCA") and have trained other Revenue Agents on offshore tax evasion issues. I have been a declarant in several other John Doe

summons investigations and have knowledge and experience regarding the John Doe summons process and its requirements.

3.      As a Revenue Agent, I have received training in tax law and audit techniques. I have also received specialized training in the ways U.S. persons use abusive offshore arrangements to unlawfully avoid paying U.S. income taxes. In addition, I have experience in investigating the abusive use of offshore entities, including foreign companies, foundations, and trusts that taxpayers use to open undeclared accounts, as well as taxpayers' abusive use of offshore credit cards to access funds in undeclared foreign accounts.

4.      In my capacity as a Revenue Agent, I have conducted examinations (audits) of taxpayers to determine their correct income tax liabilities. My audits have covered a broad range of offshore arrangements. Some taxpayers whose returns I audited established offshore entities such as foundations (which are generally taxable as foreign trusts for U.S. tax purposes) to improperly conceal their beneficial ownership of foreign assets. Other taxpayers accessed funds using credit cards issued by offshore banks in order to evade detection of their offshore income and assets. I have conducted penalty investigations involving taxpayers' failure to file required information returns such as IRS Form 3520, *Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts*; Form 3520-A, *Annual Information Return of Foreign Trust With a U.S. Owner*; Form 5471, *Information*

*Return of U.S. Persons With Respect to Certain Foreign Corporations*; and U.S. Treasury Department Form TD F 90-22.1, *Report of Foreign Bank and Financial Accounts* (commonly known as the "FBAR," which was replaced in tax year 2013 by Financial Crimes Enforcement Network ("FinCEN") Form 114). I have assisted other Revenue Agents in conducting numerous similar examinations and investigations.

5.      This declaration explains why the IRS, through the current action, seeks information to help it identify clients of the Trident Trust Group ("TT-Group") who used the TT-Group's services to create and manage offshore entities and assets from January 1, 2014, through December 31, 2023 (the "John Doe summons period"). It also explains why the requirements for a John Doe summons have been met for each of the entities on which the IRS seeks to serve a summons.

## II. <u>The Current Investigation</u>

6.      The IRS believes that U.S. taxpayers who are clients of the TT-Group may have used the services of TT-Group to create and maintain abusive offshore arrangements. (The entities that are members of the TT-Group are identified in Section IV-A and Appendix A of this declaration, below.) The IRS is therefore seeking to learn more about U.S. persons who were TT-Group clients, in particular from 2014 through 2023, who have used the TT-Group's services to establish, maintain, operate, or control:

- any foreign financial account or other foreign asset;

- any foreign corporation, company, trust, foundation, or other legal entity; or

- any foreign or domestic financial account or other asset maintained in the name of such foreign entity.

Because the IRS does not know the names or identities of the relevant clients, it is seeking leave to serve John Doe summonses.

7.    A John Doe summons is a statutorily authorized tool for IRS investigations. The IRS issues a John Doe summons to a third party when it does not know the identity of the person or persons whose tax liability is at issue. Such a summons must relate to the investigation of a particular person or to an ascertainable group or class of persons. It allows the IRS to obtain the names, records, and other information of U.S. taxpayers who may have failed to comply with the internal revenue laws, when that information is not readily available from other sources. A John Doe summons can be used to obtain information such as the identities of clients of a person or entity who provides services that can be used (or abused) to unlawfully evade payment of U.S. taxes.

8.    To facilitate this investigation, the IRS is seeking the Court's permission to serve, pursuant to 26 U.S.C. §§ 7602 and 7609(f), "John Doe" summonses to three entities:

(1) TT (USA) Holdings, Inc. ("TT-USA");
(2) Trident Corporate Services, Inc. ("TCS-USA"); and
(3) Trident Fund Services, Inc. ("TFS-USA").

4

9.     Copies of these proposed summons are attached hereto as:

Exhibit A (TT-USA);
Exhibit B (TCS-USA); and
Exhibit C (TFS-USA), respectively.

10.     Concurrently with the filing of this petition, the IRS is filing a petition

in the Southern District of New York seeking leave to serve John Doe summonses

on thirteen entities:

(1) Nevis Services Limited ("Nevis Services");
(2) FedEx Corporation ("FedEx");
(3) DHL Express (USA), Inc. ("DHL");
(4) United Parcel Service, Inc. ("UPS");
(5) Federal Reserve Bank of New York ("Federal Reserve-NY");
(6) The Clearing House Payments Company LLC ("Clearing House");
(7) HSBC Bank USA, National Association ("HSBC Bank USA");
(8) The Bank of New York Mellon Corporation ("BNY Mellon");
(9) Wells Fargo Bank, National Association ("Wells Fargo");
(10) Citibank, National Association ("Citibank");
(11) UBS AG ("UBS");
(12) Bank of America, National Association ("Bank of America"); and
(13) Deutsche Bank Trust Company Americas ("Deutsche Bank").

Copies of these proposed summonses are attached hereto as:

Exhibit E (Nevis Services);
Exhibit F (FedEx);
Exhibit G (DHL);
Exhibit H (UPS);
Exhibit I (Federal Reserve-NY);
Exhibit J (Clearing House);
Exhibit K (HSBC Bank USA);
Exhibit L (BNY Mellon);
Exhibit M (Wells Fargo);
Exhibit N (Citibank);
Exhibit O (UBS);

Exhibit P (Bank of America); and
Exhibit Q (Deutsche Bank), respectively.

The IRS is also concurrently filing a petition in the District of South Dakota seeking leave to serve a John Doe summons on Trident Trust Company (South Dakota) Inc. ("TTC-SD"). A copy of the proposed summons to TTC-SD is attached as Exhibit D.

## III.    Background on Offshore Tax Evasion and IRS Compliance Initiatives

11.    Congress and the IRS have long been concerned with the problem of U.S. taxpayers evading their U.S. tax obligations by concealing income—including income derived by unlawful means—in accounts in offshore jurisdictions with no local taxes, low taxes, or robust financial secrecy rules. That problem has been described in detail in several congressional reports, including Senate Permanent Subcommittee on Investigations, *Crime and Secrecy: The Use of Offshore Banks and Companies*, S. Hrg. No. 98-151 (1983); Senate Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations, *Tax Haven Banks and U.S. Tax Compliance*, S. Hrg. No. 110-614 (2008);[1] and U.S. Congressional Research Service, *Tax Havens: International Tax Avoidance and Evasion*, R40623 (updated Jan. 2022).[2]

---

[1] https://perma.cc/3ZBY-TEUZ.
[2] https://perma.cc/9RKH-ERML.

### A. Internal Revenue Laws Require U.S. Persons to Report Income Earned Worldwide and to Disclose All Foreign Financial Accounts

12.     There are several internal revenue laws that require U.S. persons to report international assets or entities that they own or control, and to pay tax on the associated income. These laws are among those that the IRS believes that U.S. taxpayers may be using the services of the TT-Group to violate. Also, the Bank Secrecy Act requires U.S. persons to report their interests in foreign financial accounts whose aggregate value exceeds certain thresholds. 31 U.S.C. § 5314. U.S. taxpayers who violate internal revenue laws related to the reporting of international assets or entities that they own or control often also violate the Bank Secrecy Act's reporting requirements.

13.     For federal tax purposes, a U.S. person is (1) an individual who is a U.S. citizen or U.S. resident; (2) a partnership, corporation, company, or association created or organized in the United States or under the laws of the United States; (3) an estate (other than a foreign estate) of a U.S. citizen or resident; or (4) a domestic trust. 26 U.S.C. § 7701(a)(30). A U.S. taxpayer is any person subject to any internal revenue tax. *Id.* § 7701(a)(14).

14.     U.S. taxpayers who have gross income exceeding certain thresholds must file annual income tax returns reporting to the IRS all income from whatever source derived. *Id*. § 61. This includes income they earned from sources both within the United States and outside the United States (i.e., worldwide income). U.S.

taxpayers who fail to report all their income—including income earned or held in accounts overseas—on their income tax returns have failed to comply with U.S. internal revenue laws. Every person required to make a return or statement to the IRS must include all required information. *Id*. § 6011(a). But taxpayers may attempt to evade paying taxes they owe by not reporting income that is stored or generated in foreign accounts or entities, based on their belief that the IRS will not discover it.

15.     Because offshore arrangements can be used to evade U.S. taxes, Congress and the Treasury Department have created several reporting requirements that oblige U.S. taxpayers to report annually their interests in foreign bank accounts and certain foreign assets and transactions, even if they do not owe any U.S. tax in a particular year on the assets or income involved. Failure to comply with these reporting requirements, which are described further below, both violates the internal revenue laws and indicates that the taxpayer may have violated other internal revenue laws by failing to pay taxes on taxable income in the unreported accounts. The IRS can review tax returns to determine which taxpayers have **reported** offshore accounts, but needs the information sought in the instant John Doe summonses to identify taxpayers who had **unreported** offshore accounts or entities, and to determine whether their failure to report did or did not violate the internal revenue laws.

16.    U.S. taxpayers who have a financial interest in, or signature authority over, any foreign financial account must disclose the existence of such an account on their federal income tax returns. Individuals can do so by checking the "Yes" box in response to a question at the bottom of Schedule B, *Interest and Ordinary Dividends*, which is attached to IRS Form 1040, *U.S. Individual Income Tax Return* (or Form 1040A).[3]

17.    If the aggregate value of those accounts exceeds $10,000 at any time during a calendar year, the U.S. taxpayer must also file the FBAR form with the U.S. Department of the Treasury, for that calendar year. 31 U.S.C. § 5314. Taxpayers who fail to file FBARs with respect to their foreign financial accounts typically also fail to check the box on Schedule B disclosing their interest in foreign financial accounts and usually do not report interest or other income earned in those foreign accounts.

18.    Since 2011, U.S. individual taxpayers have been required to file IRS Form 8938, *Statement of Specified Foreign Financial Assets*, with their income tax returns if the aggregate value of their specified foreign financial assets exceeds certain dollar thresholds. Since 2016, domestic entities have been required to file Form 8938 if the entities were formed or used to hold specified foreign financial assets and the total asset value exceeds reporting thresholds. The Form 8938 filing

---

[3] For tax year 2018 and later, Form 1040A is no longer in use.

requirement does not replace or otherwise affect taxpayers' obligation to file FBARs.

19.    A U.S. person who transfers property to a foreign trust, who is treated as the owner of property held by a foreign trust under the Internal Revenue Code, or who receives a distribution from a foreign trust, must generally file IRS Form 3520, *Annual Return to Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts*. A U.S. person who receives gifts of more than $100,000 from a foreign individual or a foreign estate also must file Form 3520, as must a U.S. person who received gifts of at least $10,000 (adjusted for inflation) from foreign corporations or foreign partnerships.

20.    A U.S. person who is treated as an owner of any portion of a foreign trust under the grantor trust rules is responsible for ensuring that the foreign trust files IRS Form 3520-A, *Annual Information Return of Foreign Trust With a U.S. Owner*, and that the required annual statements are furnished to its U.S. owners and U.S. beneficiaries.

21.    A U.S. person may be required to file IRS Form 5471, *Information Return of U.S. Persons With Respect to Certain Foreign Corporations*, if certain conditions are met relating to the person's ownership interest in a foreign corporation or other foreign business entity, generally where the person has significant control over that entity. *See* 26 U.S.C. §§ 6038, 6046.

22.    In 2010, Congress enacted FATCA to help enforce U.S. taxpayer compliance with reporting foreign financial assets and offshore accounts. Pub. L. No. 111-147, 124 Stat. 71, 97 (2010). This statute was enacted to help the government identify U.S. taxpayers who use undisclosed foreign financial accounts and foreign assets to hide taxable income from the IRS. FATCA requires foreign financial institutions ("FFIs") to report to the IRS annually certain information about financial accounts held by U.S. persons, including the accounts of foreign entities in which U.S. persons hold a substantial ownership interest. 26 U.S.C. § 6038D. FFIs report this information on IRS Form 8966, *FATCA Report*.

### B. Prior IRS Compliance Initiatives Have Revealed Common Indicators of Abusive Offshore Arrangements

23.    Even though U.S. taxpayers are required to disclose their foreign assets and accounts to the IRS, many do not do so. Indeed, many U.S. taxpayers have employed offshore accounts in countries with strict banking secrecy laws to conceal taxable assets and income from the U.S. government. Foreign banks and other FFIs sometimes assist U.S. taxpayers in concealing beneficial ownership of foreign assets and income. For instance, the FFIs may fail to collect or retain information about the identity of their U.S. taxpayer clients, commonly known as Know Your Customer ("KYC") information. Alternatively, they might not file information reports with the IRS regarding those clients.

24.    While FATCA filings can be a helpful source of information for the IRS, FATCA data is inherently limited. First, while this data includes certain information about qualifying accounts, this data does not provide necessary context about the transactions in that account and how the account was used in conjunction with other offshore accounts or entities. Second, in practice, the IRS has found that the information it receives is often incomplete: in some instances, key information like taxpayer identification numbers is missing. And account holders sometimes provide FFIs with incomplete or inaccurate information, so that the FATCA data does not in fact reflect the accounts' true beneficial owners.

25.    Other impediments, like delays in implementation, insufficient resources, and legal loopholes have also influenced the effectiveness of FATCA filings. A 2022 Senate Finance Committee report stated that:

> Though the *Foreign Account Tax Compliance Act* (FATCA), enacted in 2010, was intended to crack down on tax evasion by U.S. persons holding accounts and other financial assets offshore, loopholes and limited Internal Revenue Service (IRS) enforcement resources have significantly hindered the law's effectiveness. As a result, wealthy taxpayers continue to use schemes involving offshore entities and secret bank accounts to successfully hide billions in income from the IRS.

Senate Finance Committee, *The Shell Bank Loophole* at 3 (2022).[4]

---

[4] https://perma.cc/3L79-JS8N; press release at https://perma.cc/XS3C-L5BD.

26.    Because taxpayers with foreign assets do not always voluntarily report them, and even after the enactment of FATCA, third-party reporting from FFIs is limited, the IRS must also rely on alternative methods to identify offshore tax evasion. For these reasons, despite the availability of FATCA data, the IRS seeks this Court's permission to serve John Doe summonses in aid of its present investigation.

27.    Since 2000, the IRS has conducted thousands of examinations of individual taxpayers in cases developed with the aid of John Doe summonses obtained as part of its offshore compliance initiatives, including many after the enactment of FATCA. Commonalities revealed by these individual examinations have allowed the IRS to identify factors that are indicative of abusive offshore transactions.

28.    In addition to individual examinations resulting from the returns of John Doe summonses, the IRS has also undertaken multiple compliance initiatives specifically targeting abusive offshore transactions.

29.    One such program was the Swiss Bank Program. This program, which was announced by the U.S. Department of Justice on August 29, 2013, provided a

path for Swiss banks to resolve potential criminal liabilities for their role in facilitating U.S. tax avoidance.[5]

30.    The Swiss Bank Program divided Swiss banks into four categories. As relevant here, "Category 2" banks were required to advise the U.S. Department of Justice if they had reason to believe they had committed tax-related criminal offenses in connection with their clients' undeclared U.S.-related accounts. The non-prosecution agreements and statements of fact for Category 2 banks include specific details regarding how the banks interacted with their U.S. clients.[6] The details provided in these documents revealed common practices used to create, manage, and conceal abusive offshore arrangements.

31.    As a complement to increased enforcement through individual examinations and the Swiss Bank Program, the IRS has also offered a series of Offshore Voluntary Disclosure Programs (collectively, "OVDP") since 2009. These voluntary disclosure programs are designed to bring into compliance U.S. taxpayers who used undisclosed foreign accounts and undisclosed foreign entities to avoid or evade U.S. taxes. Under each iteration of the program, qualifying U.S. taxpayers

---

[5] U.S. Department of Justice, Press Release, *United States and Switzerland Issue Joint Statement Regarding Tax Evasion Investigations* (Aug. 29, 2013), https://perma.cc/4GBN-26ZN.
[6] U.S. Department of Justice, *Swiss Bank Program* (last updated September 24, 2024), https://perma.cc/5U34-NTMW.

who made voluntary disclosures of offshore noncompliance could settle their civil liabilities on fixed terms.

32.    The IRS received more than 56,000 voluntary disclosures from taxpayers with offshore accounts and entities through the OVDP. In addition, another 65,000 taxpayers have used separate streamlined procedures to correct prior, non-willful omissions and to meet their federal tax obligations. Since 2009, the IRS has collected a combined $11.1 billion in back taxes, interest, and penalties under these programs, with over 120,000 taxpayers brought into compliance.[7] Notably, the OVDPs were only open to taxpayers for whom the IRS had not already discovered the unreported offshore accounts or entities, through an audit or otherwise. Taxpayers making offshore voluntary disclosures reported the use of undisclosed bank accounts in over 600 banks or bank branches in jurisdictions around the world. The disclosures also included information about how the bank accounts were created, maintained, and concealed. By comparing large numbers of disclosures, the IRS has been further able to identify common markers of abusive—and undetected via audit—offshore transactions.

33.    Drawing from the important sources of information summarized above, among others, the IRS has identified the following features as indicators of abusive

---

[7] Internal Revenue Service, *Press Release IR-2018-176*, IRS: Offshore Voluntary Compliance Program to end Sept. 28 (Sept. 4, 2018), https://perma.cc/MU27-RW34.

offshore arrangements used by U.S. persons who may fail or have failed to comply with the internal revenue laws. Many of these features serve to help conceal the beneficial ownership of an account or asset. The presence of many of these features in TT-Group activities gives the IRS reason to believe that TT-Group clients are using TT-Group services to create and maintain abusive offshore arrangements to violate internal revenue laws.

### i.    *Offshore Accounts and Entities*

34.    Offshore tax evasion almost always involves at least one foreign financial account. Offshore tax evasion also often involves at least one offshore entity, such as a corporation, trust, or foundation. Taxpayers may use multiple entities to create several layers between themselves and their offshore accounts. For example, identification of an offshore account in the name of an offshore corporation, which is in turn owned by an offshore trust, is indicative of a potentially abusive offshore arrangement.

### ii.    *Offshore Service Providers as Intermediaries*

35.    Taxpayers seeking to avoid their U.S. tax obligations through abusive offshore arrangements often use the services of offshore service providers. Offshore service providers may facilitate the implementation of offshore arrangements by helping taxpayers create offshore entities, as well as by recommending or proposing new arrangements.

36.    In conjunction with the creation of offshore entities, offshore trust and corporate service providers often advertise related services including opening foreign bank accounts; creating corporations, trusts, and foundations; and serving as nominee directors, officers, and trustees for beneficial owners.

37.    Offshore service providers may have existing relationships with other parties to offshore transactions or arrangements, like banks, that facilitate the creation of offshore accounts and entities. They may also have expertise in complying with foreign regulations and experience dealing with foreign regulatory authorities.

38.    In addition, the intermediary role served by offshore service providers serves as another layer between taxpayers and their taxable assets, making it more difficult for the IRS to determine the true beneficial owners of an account, corporation, trust, or foundation. Taxpayers can minimize interactions linking themselves with their foreign accounts by allowing offshore service providers to interface with banks and other necessary parties on their behalf.

### iii.    *Use of Nominees and Provision of Entity Officers*

39.    Entities used to facilitate offshore tax evasion are typically controlled through nominee directors or trustees who are formally associated with the entity but are acting on behalf of the true controller, whose identity remains private. Nominee control is used to conceal the taxpayers' beneficial ownership of

offshore—and sometimes domestic—accounts and other assets in order to avoid detection by U.S. authorities (including the IRS).

40. Nominee shareholders can also be used in some jurisdictions, as can nominee founders for foreign foundations.

41. Offshore service providers can help identify persons or entities to serve as nominees or officers for their clients' entities or can serve as the nominees or officers themselves. Even if not serving as formal "nominees," offshore service providers can serve in key roles for offshore entities while allowing beneficial owners to retain control through side agreements.

### iv. *Bearer Share Corporations*

42. Offshore corporations may also be owned by the possessor of unregistered "bearer shares," making it difficult for investigators to follow a potential paper trail to identify the beneficial owner. Bearer shares are shares in a corporation that are owned by the "physical bearer of the stock certificate" and traditionally have "no recorded ownership information." *Black's Law Dictionary* (10th ed. 2014). A bearer-share corporation is owned by the person or entity holding, or "bearing," the unregistered shares.

43. Taxpayers seeking to conceal taxable income and assets can use bearer-share corporations to hide their beneficial ownership in entities and accounts since their ownership can be readily transferred without a record. "Bearer share structures

make it extremely difficult for banks (and law enforcement) to know the actual owners of accounts and to satisfy the Know Your Customer requirements." Deferred Prosecution Agreement, *United States v. Am. Express Bank Int'l*, No. 07-20602-CR (S.D. Fla. Aug. 6, 2007), Factual Statement ¶ 21.[8] Because of the risk that bearer-share corporations and accounts will be used to conceal ownership of funds from taxing authorities and others, the Federal Reserve Board of Governors and other bank regulators have encouraged U.S. private banks to discontinue their pre-existing relationships with bearer-share-owned private investment companies ("PICs"). The multi-year efforts of regulators to cut off one bank's relationships with bearer share-owned PICs are chronicled in a chapter—"[HSBC Bank USA] Private Bank Americas: Offering Bearer Share Accounts"—of a case study of HSBC that was prepared by the staff of the Senate Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations, *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*, S. Hrg. No. 112-597, at 169–400 (2012).[9] The report identified U.S. income tax evasion and money laundering as significant risks arising from HSBC Private Bank International maintaining financial accounts for bearer share owned PICs. *Id.*

---

[8] https://perma.cc/H26U-SC6R.
[9] https://perma.cc/7MQQ-B8L6.

### v.    *Use of Intermediary Addresses and Mail Forwarding Services*

44.    Another common tactic used by taxpayers seeking to avoid reporting and tax payment requirements is to conceal their identities as U.S. persons by using the mailing addresses of offshore service providers. This may include the use of the service provider's address for mail, registration, or paperwork purposes, in which case the offshore service provider may provide mail retention and forwarding services.

45.    Mail retention and forwarding services assist U.S. persons in concealing their ownership in offshore entities or bank accounts because they make it harder to locate records associating the U.S. person with the offshore account. U.S. persons avoid having records of their foreign accounts sent to the United States, and therefore conceal ownership of their accounts to U.S. taxing authorities. Such tactics are also used as a form of plausible deniability, as the U.S. persons can claim they never received any account records.

### vi.    *Private Banking and Client Services*

46.    Offshore accounts used to conceal taxable assets and income are often opened through private banking relationships. Private banks are banks, or operational units within banks, that specialize in providing financial and related services to wealthy individuals. Private banks primarily provide such services by acting as a financial advisor, estate planner, credit source, and investment manager.

To open an account at a private bank, prospective clients typically must deposit a substantial sum, often $1 million or more. In return for this deposit, the private bank assigns the account holder a "private banker," "relationship manager," or "client advisor" to act as a liaison between the client and the bank to facilitate the client's use of the bank's financial services and products. Those products and services often span the globe, enabling the client to benefit from services in carefully selected offshore jurisdictions to take advantage of their strong financial privacy laws. Offshore private banking often is used to conceal assets from the government. In 1999, the Minority Staff of the Senate Permanent Subcommittee on Investigations issued a report on private banking that concluded as follows:

> Most private banks offer a number of products and services that shield a client's ownership of funds. They include offshore trusts and shell corporations, special name accounts, and codes used to refer to clients or fund transfers.
>
> All of the private banks interviewed by the Subcommittee staff made routine use of shell corporations for their clients. These shell corporations are often referred to as "private investment corporations" or PICs. They are usually incorporated in jurisdictions such as the Cayman Islands or Channel Islands which restrict disclosure of a PIC's beneficial owner. Private banks then open bank accounts in the name of the PIC, allowing the PIC's owner to avoid identification as the accountholder.

*Private Banking and Money Laundering: A Case Study of Opportunities and Vulnerabilities: Hearings Before the Senate Permanent Subcommittee on Investigations*, S. Hrg. 106-428 at 881-82 (1999) (Minority Staff Report).[10]

47.    Examples of the kind of services or assistance banks may provide as part of their private banking services emerged from information obtained through the Swiss Bank Program. Swiss banks allowed the use of, or assisted in the formation of, offshore entities in jurisdictions such as the British Virgin Islands ("BVI"), the Cayman Islands, and Panama. U.S. taxpayers beneficially owned these entities, and ultimately used them to open Swiss bank accounts. While U.S. taxpayers were the true beneficial owners of the accounts, because the accounts were held in the name of the offshore entities, taxpayers were able to evade U.S. reporting requirements without detection.

48.    Offshore service providers who offer similar private client services, such as entity formation and assistance with the opening of bank accounts, often have relationships with private banks and their relationship managers.

### vii.    Combining Common Features for Increased Complexity and Secrecy

49.    An abusive offshore arrangement is particularly likely to be present where several of the above indicators are present together, and especially where there is a particular emphasis on secrecy. For example, the Swiss Bank Program revealed

---

[10] https://perma.cc/BVR9-Q8VX.

a common Swiss banking practice that aided tax evaders, which involved the use of so-called "structured" accounts. A U.S. person would create an offshore entity, such as a Panamanian corporation, and pay fees to third parties acting as the entity's corporate directors. Those third parties would, at the direction of the U.S. person, open a Swiss bank account in the name of the entity. In some cases, the Swiss bank was aware that the true beneficial owner of an account was a U.S. person. Despite this knowledge, the bank would obtain from the entity's directors an IRS Form W-8BEN, *Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)*, or equivalent bank document in which the directors falsely declared that the beneficial owner was not a U.S. person. Some of these accounts then traded in U.S. securities without the Swiss bank reporting earnings or transmitting any withholding taxes to the IRS, as was required by law where the beneficial owner was a U.S. person. In short, U.S. persons, intermediaries acting as corporate directors, and foreign banks together used "structured" accounts to conceal the true beneficial ownership of the Swiss accounts, helping U.S. person beneficial owners avoid taxes on the income related to those accounts. These "structured" account transactions combined the following hallmarks of abusive offshore transactions: the use of offshore accounts, the use of offshore entities, the use of offshore service providers as intermediaries, and the use of third parties as

nominee corporate directors, all with a focus on concealing the accounts' beneficial owners.

50.    A recent study concluded that U.S. tax evasion is likely much more concentrated among high earners than previously believed: the authors estimated that 30% of all unreported income is earned by the top 1% of the income distribution, with significant amounts of that unreported income concealed by abusive offshore arrangements.[11] The study's findings confirm that many of the features of concealment the IRS has identified (which are discussed above) are commonplace in abusive offshore arrangements. Among the sample of offshore tax evasion cases the authors studied, "[i]n 78% of the cases, offshore assets were held through at least one intermediate offshore structure (e.g., shell company or trust), and in 35% of the cases through multiple intertwined offshore structures." *Id.* at 12. The authors note that because of data limitations, the actual percentage of cases of offshore tax evasion involving one or more intermediate offshore structures is likely to be even higher. *Id.*

51.    The study's findings also underscore the need for multiple, complementary approaches to enforcement. For example, the authors found that

---

[11] John Guyton et al., *Tax Evasion at the Top of the Income Distribution: Theory and Evidence*, Working Paper 28542, Nat'l Bureau of Econ. Res., at 39-40 (released Mar. 22, 2021, revised Dec. 2023), https://perma.cc/W67V-36Q5.

offshore tax evasion "went almost entirely undetected" in random IRS audits carried out from 2006 to 2013. *Id.* at 3.

52.    A 2022 Senate Finance Committee investigation, focused on allegations that billionaire Robert Brockman concealed approximately $2.7 billion in income from the IRS and evaded hundreds of millions in federal taxes, also provides insight into how a combination of the features of evasion noted above can help U.S. persons conceal information from the IRS and unlawfully avoid taxes. The report describes allegations that Brockman used a complex structure involving offshore foreign trusts, foreign and domestic shell companies, nominees, and foreign bank accounts to conceal his assets and avoid taxes.[12]

53.    In sum, the classification of the above-listed features as indicators of abusive offshore arrangements is based on years of experience and research. These features reliably, although not universally, indicate likely abusive offshore arrangements used by those who may fail or have failed to comply with the internal revenue laws, and the IRS has used and continues to use them to guide its investigations.

### C. Financial Tools Used to Move Money Internationally

54.    To move money internationally between offshore entities and accounts, U.S. taxpayers and their offshore service providers use mechanisms that are

---

[12] Senate Finance Committee, *The Shell Bank Loophole* (2022), *supra* at footnote 4.

commonplace and fundamental to the global financial system. This includes taking advantage of correspondent banking relationships to engage in U.S. dollar-denominated transactions with overseas accounts and moving money via wire transfers. The use of correspondent banking services and wire transfers are not themselves indicative of abusive offshore transactions; these are required for the global financial system to function. Nonetheless, because abusive offshore arrangements rely on these otherwise lawful tools, wire transfer services and correspondent banks can be rich sources of information when investigating abusive offshore arrangements, and the information they hold is not readily available from other sources. More information about each is included below.

### i.    Use of Correspondent Banking Accounts

55.    Taxpayers with offshore financial accounts often transfer funds to or from their offshore banks through U.S. correspondent accounts maintained by those offshore banks. A correspondent banking relationship involves a foreign bank providing its clients with U.S. banking services by maintaining a correspondent account with a partner U.S. bank. In this way, the U.S. bank's services, including U.S. dollar transactions, are available to the clients of the foreign bank. Correspondent banking relationships often facilitate the transfer of funds offshore and can facilitate tax evasion. In 2001, the Minority Staff of the Senate Permanent

Subcommittee on Investigations published an investigative report on correspondent

banking, explaining:

> Correspondent banking is the provision of banking services by one bank to another bank. It is a lucrative and important segment of the banking industry. It enables banks to conduct business and provide services for their customers in jurisdictions where the banks have no physical presence. For example, a bank that is licensed in a foreign country and has no office in the United States may want to provide certain services in the United States for its customers in order to attract or retain the business of important clients with U.S. business activities. Instead of bearing the costs of licensing, staffing and operating its own offices in the United States, the bank might open a correspondent account with an existing U.S. bank. By establishing such a relationship, the foreign bank, called a respondent, and through it, its customers, can receive many or all of the services offered by the U.S. bank, called the correspondent.

> Today, banks establish multiple correspondent relationships throughout the world so they may engage in international financial transactions for themselves and their clients in places where they do not have a physical presence. Many of the largest international banks located in the major financial centers of the world serve as correspondents for thousands of other banks. Due to U.S. prominence in international trade and the high demand for U.S. dollars due to their overall stability, most foreign banks that wish to provide international services to their customers have accounts in the United States capable of transacting business in U.S. dollars. Those that lack a physical presence in the United States will do so through correspondent accounts, creating a large market for those services.

*Correspondent Banking: A Gateway for Money Laundering: Hearings Before the Senate Permanent Subcommittee on Investigations*, S. Hrg. 107-84, at 287 (2001) (Minority Staff Report).[13]

56.    Correspondent bank accounts provide domestic owners of offshore accounts with a mechanism for accessing those accounts remotely. They also are used to facilitate the transfer of U.S. dollar-denominated funds from one foreign bank to another. This can help U.S. taxpayers maintain control over, and make use of, their foreign assets while avoiding detection by the U.S. government.

57.    When a U.S. person opens an offshore account and then uses that foreign bank's correspondent banking partnership to access a U.S. bank's services, rather than transacting directly through an account with the U.S. bank itself, that may be an indication that the taxpayer is seeking to use the offshore account to conceal their status as a U.S. person.

## ii.    *Wire Transfer as Means to Move Money*

58.    Offshore service providers often facilitate the funding of a newly formed entity for a U.S. taxpayer through wire transfers.

59.    Wire transfers are processed by certain wire transfer services.

---

[13] https://perma.cc/P4FJ-2NVC.

60.    Because most international payments are transferred by wire, information from wire transfer services is particularly relevant to investigations of abusive offshore arrangements.

61.    Parties who frequently transact using wire transfers due to their involvement in offshore transactions may also use wire transfer payments in other circumstances, such as for payments between domestic entities.

## IV.    **The TT-Group**

62.    This request for John Doe summonses arises from an investigation of the TT-Group. The IRS believes that U.S. taxpayer clients of TT-Group are using TT-Group's services to facilitate the creation and maintenance of abusive offshore arrangements. Those U.S. taxpayers are believed to be in violation of the internal revenue laws. The TT-Group is an offshore service provider. As noted in paragraphs 35 through 38, above, offshore service providers often play a key role in facilitating U.S. taxpayers' creation, use, and concealment of abusive offshore arrangements. Considering the information the IRS has about common indicators of abusive offshore arrangements, and information it has gained from various sources about the TT-Group, the IRS believes that TT-Group clients who are U.S. taxpayers may have used, and may still be using, TT-Group services to facilitate offshore tax evasion. Because the identities of most of these taxpayers are currently unknown to the IRS, the IRS needs the information sought in the proposed John Doe summonses to

progress in its investigation. The information sought to be obtained from the examination of the records (and the identities of the persons with respect to whose liability the summonses are issued) is not readily available from other sources.

63.     The following sections provide an overview of the TT-Group's structure and the numerous companies that make up the "Group" for the purposes of this declaration. What follows are the aspects of the TT-Group's services that bear the hallmarks of abusive offshore arrangements, including examples of the TT-Group providing such services that have come to light during IRS investigations of other abusive offshore arrangements. The strong overlap between indicators of abusive offshore arrangements and services offered by the TT-Group, as well as known instances of U.S. taxpayers who have used TT-Group services to avoid compliance with the internal revenue laws, show why the IRS has reason to believe that U.S. taxpayers used TT-Group services to violate internal revenue laws during the years 2014 through 2023.

## A. Corporate Structure

64.     Trident Trust was founded in 1978 and currently operates in nearly 30 jurisdictions worldwide. Trident Trust is privately owned and has been providing corporate, trust, and fund administration services for over 40 years.[14]

---

[14] Trident Trust, *About Us*, https://perma.cc/7PZB-CQXB.

65.     Trident Trust operates a collective group of entities around the world, mainly under the common name "Trident" (referred to herein as the "TT-Group"). In the United States, the TT-Group has formed entities in at least two states (Georgia and South Dakota) and has offices and affiliates in other states (including Florida, New Jersey, New York, and Texas). The TT-Group includes the following entities:

### i.    *TT (USA) Holdings, Inc., Trident Corporate Services, Inc., and Trident Fund Services, Inc.*

66.     TT (USA) Holdings, Inc., is a corporation formed and registered in the state of Georgia. It was established in 1984 and is currently active. TT (USA) Holdings, Inc., took on its current name on October 29, 2014, changing it from the previously used Trident Corporate Services, Inc.[15] A new entity named Trident Corporate Services, Inc., was formed in the state of Georgia on that same date (October 29, 2014) and is also currently active.[16]

67.     Both TT (USA) Holdings, Inc. ("TT-USA"), and Trident Corporate Services, Inc. ("TCS-USA"), have their principal offices at 1100 Abernathy Road NE, 500 Northpark Building, Suite 300, Atlanta, GA 30328. A third entity, Trident

---

[15] Confirmed via Georgia's Secretary of State, Corporations Division, Certificate of Name Change, https://perma.cc/J9ZY-J6H5.

[16] Confirmed via Georgia's Secretary of State, Corporations Division, Certificate of Incorporation, https://perma.cc/8FF6-MZ5B.

Fund Services, Inc. ("TFS-USA"), is also registered in Georgia and operates from the same address.[17]

68.     According to Trident Trust's *Atlanta* webpage, the TT-Group has had a presence in Atlanta, Georgia, since 1984. The Atlanta team is divided into two operating businesses: one providing marketing and client liaison services to Latin American clients and the other providing fund administration services to U.S. based managers.[18]

69.     TCS-USA is one of the businesses operating from the TT-Group's Atlanta office. TCS-USA is a marketing and client liaison office for the TT-Group and is also home to TT-Group's Latin American and Brazil client service teams. The teams assist Latin America-focused intermediaries in both North and South America who use the Group's services around the world. TCS-USA also has an office in Miami, Florida, which provides similar services to clients and professional intermediaries in nearly twenty countries in Latin America and the Caribbean.[19]

70.     TFS-USA is the other business operating from the TT-Group's Atlanta office. TFS-USA "provides a full range of fund accounting and administration services, predominantly to Delaware funds and Cayman/Delaware master/feeder

---

[17] Confirmed via Georgia's Secretary of State, Corporations Division, via searches at https://ecorp.sos.ga.gov/BusinessSearch (last visited Dec. 11, 2024).
[18] Trident Trust, *Atlanta*, https://perma.cc/3JZP-XA9J.
[19] Trident Trust, *Miami*, https://perma.cc/FJJ3-UFWD.

structures, but also to funds domiciled in other jurisdictions such as the Bahamas and the BVI."[20] TFS-USA also has an office in Houston, Texas, which enables access to the TT-Group's full range of fund accounting and administration services for U.S.-based alternative investment managers.[21]

### ii.    Trident Trust Company (South Dakota) Inc. and Trident Corporate Services (USA) LLC

71.    TT-Group's South Dakota office serves international and U.S.-based professional advisers and their high-net-worth clients. According to its website, most of Trident's South Dakota staff have legal and/or accounting backgrounds, "ensuring that complex client needs and structures are always in good hands." The website touts its presence in South Dakota, which it claims "is frequently ranked the number one trust jurisdiction in the United States."[22] Both Trident Trust Company (South Dakota) Inc. ("TTC-SD"), formed in 2014, and Trident Corporate Services (USA) LLC ("TCS-SD"), formed in 2022, have their principal offices at 300 Cherapa Place, Suite 501, Sioux Falls, SD 57103.[23] TTC-SD previously maintained an office at 200 North Phillips Avenue, Suite 301, Sioux Falls, SD 57104.

---

[20] Trident Trust, *Atlanta*, https://perma.cc/3JZP-XA9J.
[21] Trident Trust, *Houston*, https://perma.cc/4TNG-NWJX.
[22] Trident Trust, *South Dakota*, https://perma.cc/4ZSP-7N7N.
[23] Confirmed via South Dakota Secretary of State Business Services online, via searches at https://sosenterprise.sd.gov/BusinessServices/Business/FilingSearch.aspx (last visited Dec. 11, 2024).

### iii.    *Global Entities*

72.    In addition to the United States-based entities listed above, the TT-Group operates (or operated during the relevant timeframe) through entities in at least 28 foreign jurisdictions. These TT-Group entities provide a wide range of services, including trust and corporate services, administration, management, trustee, nominee, registered agent, registered office, and entity formation services. Of the 28 jurisdictions where the TT-Group operates or has operated in recent years, twenty appear on the aggregated "Tax Haven" list in the Congressional Research Service's 2022 update on *Tax Havens: International Tax Avoidance and Evasion*.[24] The foreign TT-Group entities are summarized in Appendix A.

### iv.    *TT-Group Affiliate: Nevis Services Ltd.*

73.    Through at least March 2022, the TT-Group operated in the jurisdiction of Nevis through two entities, Morning Star Holdings Limited ("Morning Star") and Meridian Trust Company Ltd ("Meridian"). (Morning Star and Meridian have since merged into Trident Trust Company (Nevis) Limited ("TT-Nevis").) Nevis Services Ltd. ("Nevis Services") functioned as the U.S. client liaison and marketing affiliate of Morning Star. *See* Exhibit 1. While Nevis Services is not directly part of the TT-Group and does not operate under the Trident name, it nonetheless operates as part

---

[24] *Supra*, footnote 2. As the introduction to this list explains, while there is "no precise definition of a tax haven," many of them share features including "no or low taxes, lack of effective exchange of information, lack of transparency, and no requirement of substantial activity." *Id*. at 3.

of the TT-Group's network of service providers. Nevis Services was formed in New Jersey in 1996, and in 2001 it was registered in the State of New York as a foreign business corporation, where it remains registered as an active corporation.[25] Nevis Services' principal office is located at 545 Fifth Avenue, Suite 502, New York, NY 10017.[26]

### B. Services Offered by the TT-Group Bear the Hallmarks of Abusive Offshore Arrangements

74.　The multi-jurisdictional TT-Group offers a variety of services to its clients, including corporate, fund, and wealth-structuring services. As explained below, many of these services bear the hallmarks of offshore tax evasion, and there is a reasonable basis to believe that the clients of TT-Group whose information is sought by the proposed summonses have used TT-Group's services to facilitate their prior or ongoing noncompliance with federal internal revenue laws. As noted above, the majority of non-U.S. jurisdictions where the TT-Group operates were included on the list of tax havens in a 2022 Congressional Research Service report. The extent to which TT-Group services bear the hallmarks of abusive offshore arrangements is explored in more detail below. The presence of so many indicators of abusive offshore arrangements, in addition to other specific information available to the IRS which is discussed below, demonstrates why the IRS reasonably believes that TT-

---

[25] Confirmed via New York State Department of State Division of Corporations online, via search at https://apps.dos.ny.gov/publicInquiry/#search (last visited Dec. 11, 2024).
[26] *Id.*

Group clients are using TT-Group services to facilitate noncompliance with federal tax laws.

### i.    *Offshore Accounts and Entities*

75.    The TT-Group specializes in assisting clients with the formation, establishment, and ongoing administration of trusts, foundations, and corporations in foreign jurisdictions where the Group is located. They advertise their expertise in complex cross-border wealth-structuring solutions and sophisticated multi-jurisdictional structures.[27] This includes the structuring of financial assets, operating businesses, property, and other real assets.

76.    The TT-Group helps clients establish and administer a wide variety of structures, including: discretionary trusts; dynastic trusts; pre-IPO (initial public offering) trusts; charitable trusts; foundations; private unit trusts; U.S. foreign grantor trusts; employee benefit/share option trusts and private trust companies;[28] limited liability partnerships; limited duration and guarantee companies; private trust companies; special purpose vehicles;[29] protected cell companies (also known as segregated portfolio companies, in which separate "cells" are established for distinct pools of assets and liabilities for different asset classes, markets or family members); and jurisdiction-specific vehicles such as Singapore Variable Capital Companies,

---

[27] Trident Trust, *Trusts & Foundations*, https://perma.cc/5F7G-3RKF.
[28] *Id.*
[29] Trident Trust, *Company Formation & Migration*, https://perma.cc/78QC-JWCH.

Bahamas Specific Mandate Alternative Regulatory Test (SMART) Funds, Cayman Exempt Limited Partnerships, and unregulated vehicles such as Luxembourg's Sociétés de Participations Financières (SOPARFI).[30] These structures can be used to conceal the beneficial ownership of assets or accounts, and thereby used to unlawfully evade U.S. taxes.

77.    As part of their services, the TT-Group assists clients in opening foreign bank accounts.[31] As explained above, abusive offshore arrangements almost always involve at least one foreign financial account, and frequently an offshore service provider assists in opening such accounts.

78.    To support the ongoing administration and management of various entities, the TT-Group offers a full suite of trust, foundation, and administrative services, including the provision of professional trustees, KYC compliance on settlors and beneficiaries, accounting, reporting, and investment reviews.[32] The TT-Group also offers corporate services including acting as a registered office/agent, provision of corporate secretarial services, banking and accounting services, tax compliance services, and regulatory compliance services. The TT-Group also

---

[30] Trident Trust, *Private Funds*, https://perma.cc/YKH3-MRS6.
[31] Trident Trust, *Company Formation & Migration*, https://perma.cc/78QC-JWCH.
[32] Trident Trust, *Private Funds*, https://perma.cc/YKH3-MRS6.

specializes in re-domiciliation, which is the inbound and outbound migration of companies from one jurisdiction to another.[33]

79.    The TT-Group assists clients with maintaining purported corporate formalities, through services such as drafting corporate resolutions and agreements, preparing corporate minutes, maintaining books and records, and drafting agendas for board and committee meetings.[34] This facilitates the ability of taxpayers seeking to evade internal revenue requirements to create and maintain multiple layers of companies with minimal effort, which can then be used to conceal their beneficial ownership of assets or their control over foreign entities.

80.    For jurisdictions that have what are known as "economic substance" requirements—which generally prevent entities from engaging in artificial or tax-driven activities[35]—the TT-Group in some cases provides services to "enhance" an entity's economic substance, including by providing meeting rooms and conferencing facilities for quarterly board meetings, providing office premises and information technology support, and even "the sourcing of a dedicated employee to be included in the company payroll to assist with the day-to-day activities of the

---

[33] Trident Trust, *Company Formation & Migration*, https://perma.cc/78QC-JWCH.

[34] Trident Trust, *Fiduciary & Directorship Services*, https://perma.cc/VES6-J87J.

[35] Economic substance requirements vary across jurisdictions. Some of the common elements include maintaining a physical presence to ensure the business has genuine operations, having an adequate number of employees engaged in the decision-making process and other essential business functions, and having tangible assets in the jurisdiction that are proportionate to the business activities conducted—which contributes to validating a company's presence. *See* Wall Street Mojo, *Economic Substance*, https://perma.cc/UL5J-R83N.

company."[36] This results in an entity, which may in reality exist only as part of an abusive offshore arrangement to avoid taxes, that has the false appearance of economic substance and active operations.

### ii.   *Offshore Service Providers as Intermediaries*

81.    Information available to the IRS also shows that TT-Group entities—many of which are offshore service providers—act as intermediaries between clients and institutions, between clients and other service providers, and between other service providers and institutions.

82.    I reviewed data that the IRS obtained pursuant to other John Doe summonses which showed that the TT-Group established offshore entities for U.S. clients of other service providers and then maintained, operated, or controlled those entities for those clients.

83.    For example, the IRS obtained documents related to the Wessell Group, a U.S. service provider, from Nevis Services pursuant to a John Doe summons. *See In re Tax Liabs. of John Does (Wessell Group)*, No. 1:18-mc-00423-PKC (S.D.N.Y. Oct. 12, 2018). The documents revealed instances in which members of the Wessell Group contacted Morning Star (one of the entities that TT-Group previously operated in Nevis, and which has since merged into TT-Nevis) and Nevis Services for assistance in establishing Nevis entities for its U.S. clients. The Wessell Group

---

[36] Trident Trust, *Economic Substance*, https://perma.cc/B8S8-8RYU.

requested that Morning Star send formation documents via FedEx, and Nevis Services informed the Wessell Group when Morning Star filed formation documents with regulators. As stated in paragraph 73, above, Nevis Services at that time was the U.S. client liaison and marketing affiliate of Morning Star.

84.    The summonsed documents show numerous instances in which Morning Star (now TT-Nevis) served as an offshore intermediary for Wessell Group clients. For instance, with a 2011 letter, Morning Star sent formation documents from Nevis to the Wessell Group in the United States via FedEx, including a Certificate of Formation, Articles of Organization, a sample Operating Agreement, meeting minutes, and a stock certificate, along with an invoice for services rendered. Other correspondence shows that Morning Star managed offshore companies' statutory registration fee payments and provided registered agent services for Wessell Group clients. As an example, in 2018, a Morning Star employee sent an email to the Wessell Group that included an *LLC Information Form* to be completed for a Wessell Group client in order to comply with new due diligence requirements on entities for which Morning Star provided registered agent services. The email included a statement urging the Wessell Group to contact Morning Star's office or Nevis Services in New York with any questions and included each company's email address. Morning Star helped Wessell Group U.S. clients maintain and establish offshore entities, and shared information among its affiliates to do so.

85.     The Wessell Group documents also show that TT-Panama served as an offshore intermediary for Wessell Group clients. Those documents included invoices issued by TT-Panama for services provided for Wessell Group clients. I reviewed 20 invoices issued in 2012 by TT-Panama and found that these invoices were addressed to the client's offshore entities, care of the Wessell Group. Additional research revealed that the beneficial owners of these entities were U.S. taxpayers (i.e., had a U.S. address and Social Security number). TT-Panama billed for registered agent renewals, registered office fees, and director and officer services. The invoices also sought reimbursement of government fees, such as annual license fees, that were paid by TT-Panama on behalf of U.S. Wessell Group clients. The invoices provided instructions on remitting payment to TT-Panama in exchange for these services. TT-Panama thus also helped Wessell Group clients maintain and establish offshore entities.

86.     TT-Group entities and affiliates also served as intermediaries with Panamanian legal services company Sovereign Management and Legal, Ltd. ("SML"). Documents obtained pursuant to a John Doe summons served upon Michael Behr, an employee of SML who resided in the United States, included email communications with TT-Group affiliate Nevis Services. *See In re Tax Liabs. of John Does (Sovereign Mgmt. & Legal, Ltd.)*, No. 2:17-cv-00002-BMM (D. Mont. Jan. 18, 2017). These 2011 emails included attachments transmitting invoices (i.e.,

Statement of Account) issued by Morning Star to SML for services rendered to SML clients. The invoices included entity names for which the services were performed and the amounts billed to each entity. Printed on these invoices were wire instructions for paying Morning Star.

87.    The IRS also received documents related to SML pursuant to a John Doe summons served upon HSBC Bank USA for the U.S. correspondent account of HSBC Bank (Panama) SA ("HSBC-Panama"), a bank used by SML. *See In re Tax Liabs. of John Does (Sovereign Mgmt. & Legal, Ltd.)*, No. 1:14-mc-00417 (S.D.N.Y. Dec. 19, 2014). That data included three 2009 wire transfers whose originator was a company with a U.S. address and for which TT-Panama was the beneficiary. The funds were deposited into TT-Panama's account at HSBC-Panama. The data also included 19 checks issued to TT-Panama in 2009 and 24 checks issued to TCS-Hong Kong, TCS-Bahamas, TT-Cayman, TT-Guernsey, TT-Isle of Man, and TT-Panama in 2013 for which the payors were individuals and companies with U.S. addresses. These payments were for entity formation, name change, and registered agent renewals, which is evidence that SML clients used the services of TT-Panama and other TT-Group entities to establish and maintain their offshore entities. Some of the checks revealed the name of Panamanian entities in the memo section of the check, revealing a nexus between U.S. taxpayers and foreign entities. Other checks referenced invoice numbers in the memo section. Inspection of a sample of these

42

checks revealed that during 2013, several U.S. entities and individuals in Florida, Massachusetts, and New York made payments to TT-Panama that appeared to relate to intermediary services TT-Panama provided for SML clients.

88.    The IRS also obtained documents related to SML pursuant to a John Doe summons served upon FedEx and DHL. *See In re Tax Liabs. of John Does (Sovereign Mgmt. & Legal, Ltd.)*, No. 1:14-mc-00417-P1 (S.D.N.Y. Dec. 19, 2014). These documents showed that Nevis Services, a U.S.-based affiliate of the TT-Group, coordinated with International Corporate Services Limited, an offshore service provider located in Belize. In particular, Nevis Services received two deliveries via DHL from International Corporate Services Limited in 2010 and 2012. Thus it appears that Nevis Services may have acted as an intermediary between its U.S. clients and another offshore service provider. The summons data also showed that in 2013 and 2014, TT-Jersey received four deliveries via FedEx Air from Belize Offshore Services Limited, another offshore service provider in Belize. This indicates, again, that a TT-Group entity may have been acting as an intermediary between clients and other offshore service providers.

89.    The above examples show that TT-Group entities have been acting as intermediaries for other offshore service providers, like SML, International Corporate Services Limited, and Belize Offshore Services Limited, and as

intermediaries between U.S-based clients and regulatory authorities in places like Nevis.

### iii.    Use of Nominees and Provision of Entity Officers

90.    The TT-Group's services include the provision of professional trustees, corporate directors (and in some instances, resident individual directors), nominee shareholders, and nominee members. TT-Group entities can also act as corporate secretaries and bank signatories for client entities.[37] When offshore service providers act as bank signatories, this helps to conceal client identities and their beneficial ownership or control over their accounts. Taxpayers seeking to avoid U.S. tax and reporting requirements can use trustees, directors, shareholders, and members associated with offshore service providers, rather than the taxpayers or their associates, to conceal their beneficial ownership of assets or their control over foreign entities.

91.    As an example, research revealed that TT-Panama lawyers Martha Salazar and Samantha Federico and TT-UK accountant Sandra Dixon have relationships with an unusually large number of Panamanian entities, according to data from the Panama Public Registry and Panama Panadata (a third-party data provider). As of July 17, 2024, Salazar was listed as a founder of 2,039 companies in Panama, a director of 32, and an officer of 23, and was otherwise linked to 152

---

[37] Trident Trust, *Fiduciary & Directorship Services*, https://perma.cc/VES6-J87J.

other Panamanian entities, for a total of 2,246 relationships. Federico was listed as a founder of 838 Panamanian companies, a director of 55, and an officer of 52, and was otherwise linked to 57 other Panamanian entities, for a total of 1,002 relationships. Similarly, as of July 17, 2024, Dixon was listed as a founder of 968 Panamanian companies, a director of 115, and an officer of 112, and was otherwise linked to 97 other Panamanian entities, for a total of 1,292 relationships. By providing TT-Group lawyers and employees to serve as founders, nominee directors and officers, and in other corporate roles for Panamanian entities, the TT-Group makes it easier for the beneficial owners of those entities to conceal their identities.

92.    As another example, I learned from information available to the IRS that a BVI law firm reviewed trust deeds prepared by TT-BVI in connection with the establishment of BVI trusts—for U.S. clients—of which TT-BVI was appointed as trustee. This is further evidence that the TT-Group established offshore trusts for U.S. taxpayers, and then served as trustees, thereby assisting taxpayers in concealing their relationship to the offshore trusts.

### iv.    *Bearer-Share Corporations*

93.    Some TT-Group jurisdiction information pages promote (or promoted during the relevant time period) the ability to use bearer shares as a benefit of incorporating in their jurisdiction, including the BVI, the Cayman Islands, Luxembourg, Nevis, and Panama. *See* Exhibits 2 (showing bearer share jurisdictions

as of July 2020), and 41 (showing bearer share services offered in the Cayman Islands as of November 2023). As explained above, the use of bearer-share corporations severely limits the U.S. government's ability to link a taxpayer to a corporation, and is often associated with money laundering and tax evasion.

### v.    Use of Intermediary Addresses and Mail-Forwarding Services

94.    The TT-Group also offers mail-retention and forwarding services. The TT-Group's website states that it can receive and distribute all correspondence addressed to a company,[38] collect and process mail,[39] and act as the designated recipient for legal correspondence on behalf of businesses engaged in international transactions in jurisdictions in which the clients do not have a physical presence or address (i.e., agent for service or process).[40] As discussed above, taxpayers seeking to conceal their beneficial ownership of offshore assets or control over offshore entities from the IRS often use such services to make it more difficult to link themselves to the abusive offshore arrangements.

95.    TT-Group's provision of mail-retention and forwarding services is further confirmed by Morning Star's *LLC Formation Questionnaire and Information Form* for Nevis LLC companies, and Morning Star's 2017 Nevis Business Corporation Ordinance ("NBCO") form, the *NBCO Incorporation Questionnaire*

---

[38] Trident Trust, *Fiduciary & Directorship Services*, https://perma.cc/VES6-J87J.
[39] Trident Trust, *Economic Substance*, https://perma.cc/B8S8-8RYU.
[40] Trident Trust, *Transaction Support*, https://perma.cc/R4LB-BWVM.

46

*and Information Form*, both of which were previously available on Morning Star's website and which I preserved. *See* Exhibits 3 and 4 at 4. Clients could choose to pay Morning Star to collect all mail and forward to it to the client at the end of each quarter, retain all mail on file, or destroy all mail. In addition, Morning Star's Fee Schedule for Nevis LLC Companies as of January 2020, which I accessed and preserved, showed it charged $150 for mail-forwarding or hold-mail services. *See* Exhibit 5.

96.    TT-BVI's *Terms of Business* agreement as of June 2017 also reflected TT-Group's provision of mail-forwarding services for its clients. *See* Exhibit 6. According to Section 5.5, "The Client shall be duly informed of any mail received by the Company and shall be given an opportunity to subscribe to a mail forwarding service provided by the Registered Agent, (the conditions and terms of which are provided either on request or when mail is first received for a specific Company)." Similarly, Section 5.6 of TT-Cyprus's *Terms of Business* agreement for non-fiduciary services as of October 2017 authorized it to "open and read all and any correspondence, letter, fax or other communication received by the Service Provider on behalf of the Client"—in effect, giving TT-Cyprus permission to receive and hold client mail. Exhibit 7. Finally, Section 5.5 of the *Terms of Business* for TTC-SD for trusts as of July 2020 had similar language to that of TT-Cyprus, except that TTC-SD was also authorized to open and read its clients' *electronic* mail. Exhibit 8.

Together, these documents provide examples of multiple TT-Group entities offering mail-retention and forwarding services that are commonly utilized by U.S. persons seeking to avoid IRS detection of beneficial ownership and taxable income and assets.

### vi.    *Private Banking and Client Services*

97.    The TT-Group offers private client services to high-net-worth individuals, which include wealth structuring and preservation, asset protection, and succession planning. These services typically include the formation of an entity, such as a trust or foundation, which usually requires a financial account. According to its *Company Formation & Migration* webpage for private clients, the TT-Group assists with all aspects of establishing a company, including "opening a new bank account if required."[41] According to its *Panama Office* webpage, the Panama team "assists clients with guidance on the opening of bank accounts in Panama."[42] Given that the TT-Group offers private client services, combined with entity formation and assistance with the opening of bank accounts, the TT-Group likely has relationships with private banks and relationship managers, thus linking the TT-Group to private banking services for their private clients.

---

[41] Trident Trust, *Company Formation & Migration*, https://perma.cc/78QC-JWCH.
[42] Trident Trust, *Panama*, https://perma.cc/QTV7-RT96.

98.    As part of its fiduciary services, TT-Group offers a number of services so that its clients are in compliance with FATCA. These services include FATCA sponsorship and reporting services, including the submission of IRS Forms 8966.[43] A review of FATCA data where TT-Group entities were the sponsoring FFI or reporting FFI revealed that there were filings on which account balances of U.S.-related accounts exceeded $1 million, and some of those balances exceeded $10 million. These high-value accounts suggest the TT-Group may have assisted in structuring or facilitating arrangements that involved private banking or high-wealth client relationships.

### vii.    General Focus on Secrecy and Concealment

99.    In addition to the specific attributes listed above, the TT-Group's marketing materials reflect a significant focus on the secrecy and privacy it offers its clients. TT-Group webpages and information sheets advertise TT-Group's various services throughout different jurisdictions that provide clients the ability to keep their beneficial ownership information confidential, avoid public reporting, and avoid registering an entity. An intense focus on concealing beneficial ownership of offshore assets is common among U.S. taxpayers seeking to avoid compliance with the internal revenue laws.

---

[43] Trident Trust, *Regulatory Compliance & Reporting*, https://perma.cc/KH6N-P74Y.

100.    The TT-Group's emphasis on privacy and secrecy is present throughout its marketing materials. For example, the *Key Facts* webpages for various TT-Group entities[44] identify jurisdictions where the names of shareholders are not filed in any public registry or record (Panama Companies Key Facts, BVI Companies Key Facts); where there are statutory confidentiality requirements (Panama Foundations Key Facts, Mauritius Trusts Key Facts, Bahamas Foundations Key Facts); where trusts do not need to be registered (Guernsey Trusts Key Facts, Isle of Man Trusts Key Facts, Malta Trusts Key Facts); where beneficial ownership is confidential (Hong Kong Companies Key Facts, Guernsey Companies Key Facts, Nevis International Business Environment Key Facts); and where nominee founders or nominee registered shareholders can be used (Panama Foundations Key Facts, Bahamian IBC Key Facts, Jersey Company Key Facts). The *Key Facts* page for the Dubai Multi Commodities Centre (DMCC) in the United Arab Emirates lists as "advantages" that there is "no tax information exchange agreement with any country" and "no public disclosure of information." *See* Exhibits 9-21.

101.    In the wake of new regulations requiring certain foreign-owned U.S. business entities to begin filing annual forms with the IRS in 2018, the TT-Group advised its clients to "consider cancelling structures prior to December 13, 2017," and explained that if foreign-owned structures subject to the new reporting

---

[44] Trident Trust, *Brochures & Fact Sheets*, https://perma.cc/F248-BWLB.

requirements were terminated before this date, the entity would not need to make the IRS filing.[45]

102.    The TT-Group also offers what are known as "shelf company" services, which can be used to conceal beneficial ownership. *See* Exhibit 2. Previous versions of TT-Panama's *Companies Key Facts* webpage stated that "[s]helf companies are available for immediate delivery," and informed prospective clients that TT-Panama's listing of available shelf company names is updated on a daily basis. *See* Exhibit 23 at 2. "The term 'shelf company' is typically (although not uniformly) applied to a company that (a) is incorporated with a standard memorandum or articles of association; (b) has inactive shareholders, directors, and secretary; and (c) is left dormant—that is, sitting 'on a shelf'—for the purpose of later being sold." Emile van der Does de Willebois et al., World Bank Stolen Asset Recovery Initiative, *The Puppet Masters: How the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do About It*, 37 (2011).[46] Shelf companies can be used to conceal ownership of bank accounts, and are therefore of concern to law enforcement authorities. *Id.* at 38-39. Based on my experience, the use of "shelf" or previously formed corporations is a common practice designed to create the false impression that an offshore entity was in business prior to the beneficial owner's

---

[45] Trident Trust, *New Annual U.S. Tax Reporting Required for Foreign-Owned U.S. LLCs and Other Entities* (Apr. 4, 2017), https://perma.cc/38U7-ULJL.
[46] https://perma.cc/8LPG-TGS5.

involvement. When using a shelf company to evade taxes, the beginning of the tax evasion will not coincide with the creation of the company, making the use of that company to evade taxes more difficult for the IRS to detect. Additionally, the change in ownership when a U.S. person purchases a shelf company may not be reported or recorded, resulting in dead-end investigations that lead only to a "formation agent who has long ago sold the company with no records of the purchaser and no obligation to note the ownership change." *Id.*

103.    The TT-Group's operations in South Dakota also align with its emphasis on secrecy. South Dakota has become a top trust destination not only in the United States, but globally, in recent years. South Dakota allows for what is called the "decanting" of assets "from one trust to another without notice to beneficiaries who may be cut out of the new trust" and "allows DAPT [Domestic Asset Protection Trust] assets to be protected from alimony, divorce and child support claims—so long as those claims didn't exist when assets were first transferred into the DAPT."[47]

104.    The practice of decanting allows financial planners to modify irrevocable trusts and is becoming a key planning strategy in asset planning for high-

---

[47] Christopher Helman, *How to Hide a Billion Dollars: Three Techniques the Ultrarich Use to Dodge Ex-Spouses, the Taxman and Disgruntled Business Partners*, Forbes (Sept. 4, 2020), https://perma.cc/8742-4BTR; *see also* Anna Sulkin Stern, *Asset Protection Gets Ugly in Bosarge Divorce*, Wealth Management (Sept. 14, 2020), https://perma.cc/KJC9-AH4F.

wealth individuals. Also referred to as a "do over," decanting essentially distributes assets from an irrevocable trust into a new trust with different, and presumably more desirable and flexible, terms, leaving the unwanted terms in the original trust and not binding on the assets. Decanting allows the easy transfer of a trust from one state jurisdiction to another jurisdiction that has more favorable asset protection trust statutes.[48]

105.    Asset protection is a legitimate consideration for arranging an individual or entity's financial affairs. Nonetheless, in my experience, arrangements that lawfully serve to protect assets from creditors also can be used to facilitate the unlawful concealment of assets or income from the IRS. Similarly, while "asset planning" or "estate planning" can lawfully minimize the amount of tax required to be paid, some taxpayers use tools and strategies from these fields to illegitimately conceal their beneficial ownership of assets or income from the IRS in order to unlawfully avoid paying U.S. taxes.

106.    Setting up a trust in South Dakota has recently become popular with individuals who want to minimize their tax liabilities and shelter their assets. South Dakota has no state income tax, capital gains tax, or inheritance tax. South Dakota law includes strong protections that provide anonymity and shield assets from

---

[48] *See* Bridgeford Trust Co., *Decanting: A Powerful Planning Tool for Advisors*, https://perma.cc/CD7F-FFTH.

creditors. Trusts established in South Dakota last forever, and court documents relating to them are also kept private forever.

107.    While many people are drawn to South Dakota trusts due to a legitimate interest in asset protection and estate planning, others come to the state seeking to take advantage of its protections for less legitimate purposes. As well-known tax havens like Switzerland and Luxembourg have been "forced by an international crackdown on tax evasion by the rich to turn over records of some account holders, tiny South Dakota has become a nouveau international trust magnet, attracting more than $300 billion in assets."[49]

108.    Much of the money being moved into South Dakota trusts was previously held in offshore entities. This process—moving money from an offshore account into a United States jurisdiction—is called "onshoring."[50]

109.    Bloomberg reported in 2016 that the TT-Group "moved dozens of accounts out of Switzerland, Grand Cayman, and other locales and into Sioux Falls, S.D., in December [2015], ahead of a Jan. 1 [2016] disclosure deadline."[51]

110.    The onshoring of offshore trusts into South Dakota by U.S. taxpayers indicates that an offshore trust previously existed. Because of onshoring, particularly

[49] Christopher Helman, *How to Hide a Billion Dollars*, *supra* footnote 47.
[50] Joan K. Crain & Myriam Soto, *Onshoring Your Offshore Trust to the U.S.*, BNY Mellon Wealth Management (Jul. 2020), https://perma.cc/LZK8-XUXB.
[51] Jesse Drucker, *The World's Favorite New Tax Haven Is the United States*, Bloomberg Businessweek (Jan. 27, 2016), https://perma.cc/X9WS-62RE.

to South Dakota due to its legal protections for trusts, TTC-SD is particularly likely to have information identifying previously offshore trusts and accounts that have since been onshored to the United States. The IRS needs this information to determine whether the previously offshore trusts were properly reported, and whether required taxes were paid on income associated with those trusts. In addition, these records will help identify domestic accounts or other assets held in the name of a foreign entity but beneficially owned by U.S. taxpayers who may have established a South Dakota trust.

111.    Finally, in addition to its emphasis on secrecy, the TT-Group's website references the goal of tax planning in creating entities for its clients. For example, Isle of Man Trusts are advertised as "offer[ing] suitable solutions" for tax planning, and "tax and estate planning" is listed as the first common use of Bahamas Foundations. Exhibits 15 and 13. Such advertising may make the TT-Group more likely to attract clients who are trying to not only lawfully minimize their tax obligations, but also to unlawfully evade the internal revenue laws.

### viii.    *Use of Correspondent Banking Accounts and Wire Transfers to Move Money*

112.    Information from TT-Group publications and other investigations of abusive offshore transactions about the TT-Group's use of correspondent banking accounts and wire transfers provide further evidence of connections between U.S. persons, the TT-Group, and potentially abusive offshore arrangements.

113.   For example, the IRS received data in connection with previous John Doe summonses served upon BNY Mellon and Wells Fargo showing that TT-Group entities received funds via the U.S. correspondent bank accounts of Butterfield-Cayman at BNY Mellon and of FCIB-Cayman at Wells Fargo. *See In re Tax Liabs. of John Does (Butterfield Bank)*, No. 1:13-mc-00377 (S.D.N.Y. Nov. 12, 2013); *In re Tax Liabs. of John Does (CIBC FirstCaribbean Int'l Bank Ltd.)*, No. 3:13-cv-01938-TEH (N.D. Cal. Apr. 29, 2013). That data showed that from 2004 to 2013, TT-Group entities in the Bahamas, Barbados, BVI, Cayman Islands, Isle of Man, and Mauritius were the beneficiaries of wires from persons with U.S. connections.

114.   A sample of data available from the responses to previous summonses revealed the following transfers involving FirstCaribbean International Bank Limited ("FCIB"), where several TT-Group entities have accounts:

- In 2008, a $10,000 wire was sent from Nevis Services (with an Atlanta, Georgia, address) to Morning Star (now TT-Nevis).

- In 2009, TT-UAE wired $55,809.99 to TT-BVI for "invoice due TBVI."

- In 2009, a company in Pompano Beach, Florida, wired $650 to TT-BVI for "reference: annual maintenance," showing that a U.S. taxpayer used TT-BVI to maintain a foreign account or entity.

- In 2011, Morning Star/Meridian Trust (now TT-Nevis) paid a $5,085.03 referral fee to TCS-Switzerland in Zurich.

115.   Additionally, I learned from data the IRS received pursuant to a prior John Doe summons that TT-BVI was a beneficiary of wires sent from Zürcher

Kantonalbank in Switzerland, through UBS AG in Switzerland, to a UBS branch in New York City. Zürcher Kantonalbank has a U.S. correspondent account with Citibank in New York City ending in 9476. UBS AG, a foreign bank, has a U.S. correspondent account with UBS in New York City ending in 5000. *See In re Tax Liabs. of John Does (Zürcher Kantonalbank)*, No. 1:13-mc-00378-P1 (S.D.N.Y. Nov. 7, 2013).

116.    According to a *Statement of Account* issued by Morning Star dated December 29, 2017, which included wire transfer instructions for making a payment, Morning Star maintained an account with the Bank of Nevis Limited in Nevis. Exhibit 25. The invoice instructed clients to send wire transfers to The Bank of New York (now BNY Mellon), for credit to Lloyds Bank Plc in London, United Kingdom, for the account of the Bank of Nevis Limited (the financial institution beneficiary), for further credit to Morning Star's account (final beneficiary) with the Bank of Nevis Limited. That clients were instructed to wire funds to Morning Star from a U.S. bank suggests those instructions were directed to clients who likely were U.S. taxpayers.

117.    Information obtained by the IRS through other John Doe summonses showed that from 2007 to 2014 TT-Group entities frequently sent or received wires and checks to and from individuals and companies with U.S. addresses. In many instances, the data referenced the service provided (e.g., company registration,

payment for legal services, annual maintenance), an invoice number, or other description (e.g., transfer to operations account, for investment, or 6 invoices as per email), and the names of offshore entities whose formation or maintenance were presumably facilitated by the TT-Group. Some of the TT-Group entities that were parties to the known wire transactions included entities in the Bahamas, Barbados, BVI, Cayman Islands, Cyprus, Guernsey, Hong Kong, Isle of Man, Jersey, Panama, the Seychelles, Switzerland, and the U.S. Virgin Islands, as well as TCS-USA, Morning Star and Meridian Trust (since merged into TT-Nevis), and Nevis Services.

### C. The IRS Has Specific Examples of Tax Non-Compliance by TT-Group Clients

118.    As described above, the TT-Group's services, marketing, and operating jurisdictions heavily feature indicators of abusive offshore transactions and presence in tax havens. But that is not the only reason the IRS believes that TT-Group clients may be using its services to avoid U.S. tax requirements. Another reason is that the IRS has encountered several instances of TT-Group clients doing just that. The following sections provide specific examples known to the IRS of TT-Group clients using its services to violate the internal revenue laws. These examples further support the IRS's belief that members of the John Doe class are reasonably likely to have used TT-Group services to avoid compliance with internal revenue laws.

### i.    *Examples from the Voluntary Disclosure Programs*

119.   A review of voluntary disclosure submissions revealed that at least nine U.S. taxpayers who used the services of the TT-Group reported their non-compliance to the IRS. A review of these voluntary disclosures and other information available to the IRS shows that U.S. taxpayers used the services of the TT-Group to avoid U.S. taxes. These taxpayers failed to report their offshore accounts, their ownership interest in offshore entities, and earnings from their offshore accounts to the IRS. Having failed to report the earnings, they likely also failed to pay any required taxes on those earnings. In addition, these U.S. taxpayers failed to file FBARs disclosing their foreign financial accounts.

120.   Below is a summary of the circumstances of five U.S. taxpayers who submitted voluntary disclosures to the IRS and used the services of the TT-Group to establish offshore accounts or entities that were not timely disclosed to the IRS. Although the disclosure years in the following OVDP summaries fall outside the John Doe summons period at issue here, these disclosures are still relevant because they show tax noncompliance among U.S. taxpayers that was facilitated by the TT-Group and whose records were maintained by the TT-Group. This evidence of specific non-compliance shows that the information sought in these summonses will likely reveal further violations of the internal revenue laws via information that is not otherwise readily available to the IRS. Before the voluntary disclosures

discussed below, the client identities were unknown to the IRS, demonstrating that U.S. taxpayers used TT-Group services to violate tax laws without being detected by the IRS, and showing why this John Doe summons is necessary to identify other such taxpayers.

### a. *Taxpayer A*

121.    Taxpayer A is a U.S. citizen who possesses a U.S. passport and a Belgian passport. At the time of her disclosure submission in 2012, Taxpayer A was living in Israel and listed her occupation as a student. Although Taxpayer A was married at one time, her marital status was not identified, and her husband was not included in her voluntary disclosure submission. During the disclosure period, which covered 2004 through 2011, Taxpayer A had a financial interest in seven previously undisclosed offshore accounts, five of which were held in Switzerland, one in Belgium, and one in Israel.

122.    According to the disclosure submission, Taxpayer A used the services of TT-BVI to form and operate the offshore arrangement depicted in the diagram below:



123.   TT-BVI advised or assisted Taxpayer A in opening and maintaining Swiss Accounts A-1 and A-2 in the names of Panamanian Corps A-1 and A-2, respectively.

124.   TT-BVI assisted with the formation and operation of the BVI Trust.

125.   A lawyer in Switzerland served as a trustee of the BVI and Jersey Trusts. That trustee and Taxpayer A's husband facilitated the opening of Swiss Account A-1. Taxpayer A signed Swiss Account A-2 documents at her husband's request and did not communicate directly with the bank, thereby making it more difficult to link her to the account. Swiss Account A-1 was closed before Taxpayer A submitted her voluntary disclosure to the IRS. Had Taxpayer A not voluntarily disclosed this account after the fact, the U.S. government would likely never have learned of its existence.

126.   Swiss Account A-2 was still open as of the date of Taxpayer A's disclosure submission.

127.   Taxpayer A's parents and their businesses were the principal source of the funds held in the offshore accounts. Over time, her parents transferred partial ownership of their businesses and investments to trusts for Taxpayer A and her two brothers.

128.   Taxpayer A had a foreign address and passports issued by both the United States and Belgium. Based on my training and experience, I know that when U.S. citizens have multiple citizenships and a foreign address, this presents an opportunity to conceal their U.S. citizenship (i.e., U.S. person status) by presenting identification issued by a foreign country when opening an offshore account and thus avoiding U.S. reporting requirements.

129.   By forming offshore corporations that were owned by offshore trusts and communicating with the Swiss Bank through intermediaries with the assistance of TT-Group entities, Taxpayer A was able to conceal her beneficial ownership of the Swiss Accounts through layers of entities and thus avoid detection of her failure to comply with internal revenue laws.

130.   Despite being required to do so by United States law, Taxpayer A did not report to the IRS the existence of the Swiss Accounts, the Panamanian

Corporations, the BVI and Jersey Trusts, or income related to the offshore accounts, until she made a voluntary disclosure in 2012.

131.   TT-Group entities maintained information not readily available from other sources that would have allowed the IRS to identify Taxpayer A, and the fact of her non-compliance, before her voluntary disclosure.

### b.  *Taxpayer B*

132.   Taxpayer B and his spouse are U.S. citizens and have U.S. passports. At the time of their disclosure submission in 2010, both were retired and living in Poland. Taxpayer B and his spouse are also Polish citizens by birth.

133.   According to their disclosure submission, which covered 2003 to 2008, Taxpayer B and his spouse had a financial interest in twelve previously undisclosed foreign accounts, which included 28 sub-accounts. Nine "master" accounts (including 26 sub-accounts) were opened at banks in Switzerland, and the rest were opened at banks in Poland. Eight of the nine Swiss accounts were closed by 2009. All three accounts in Poland were still open as of the date of Taxpayer B's voluntary disclosure submission. Taxpayer B's business and investment income were the primary sources of the funds in the offshore accounts.

134.  Of the twelve previously undisclosed foreign accounts, TT-Group entities facilitated the creation or maintenance of at least six of the Swiss accounts and one of the Polish accounts. According to the disclosure submission, Taxpayer B and his spouse used the services of TCS-Switzerland to form and maintain those accounts as part of the offshore arrangement depicted below:



135.  TCS-Switzerland facilitated the formation of BVI International Business Companies B-1, B-2, and B-3.

136.  Ultimately, Taxpayer B and his spouse beneficially owned the six Swiss accounts and one Polish account through these BVI entities. However, because the accounts were opened in the names of the BVI entities, rather than the

taxpayers, it was easier for Taxpayer B and his spouse to conceal their beneficial ownership of the accounts. The remaining Swiss and Polish accounts were not held through an entity, but rather were in the taxpayers' own names.

137.  Despite being required to do so, Taxpayer B and his spouse did not report the existence of their offshore accounts and BVI entities, or income related to their offshore accounts, to the IRS, until they made a voluntary disclosure in 2010. Taxpayer B and his spouse did not file all required FBARs for the years covered by the disclosure period.

138.  TT-Group entities maintained information not readily available from other sources that would have allowed the IRS to identify Taxpayer B, and his tax non-compliance, before his voluntary disclosure.

### c.  *Taxpayer C*

139.  Taxpayer C is a U.S. citizen and maintains a U.S. passport. At the time of his disclosure submission in 2014, Taxpayer C lived in Russia and listed his occupation as chief executive officer. From 2006 through 2013, Taxpayer C held financial interests in at least 40 reportable offshore accounts, including 34 accounts in Russia (including two sub-accounts), two accounts in Cyprus, and four accounts in Switzerland (including three sub-accounts). The source of funds in the accounts included taxable wages, loan proceeds, investment income, and gains on the sale of shares in a corporation. The two Cyprus accounts (Cyprus Accounts C-1 and C-2)

and one of the Swiss accounts (Swiss Account C-4) were nominally owned by an International Business Corporation in the BVI (BVI IBC C-1). All of the remaining accounts were Taxpayer C's personal accounts and held in his own name.

140.  According to the disclosure submission, Taxpayer C used the services of a TT-Group entity (likely TT-Cyprus) to ultimately move assets from accounts in his own name to newly created accounts in the name of a BVI Corporation via the offshore arrangements depicted below:



141.   TT-Group employees who are believed to have worked at TT-Cyprus assisted Taxpayer C in setting up and opening Cyprus Accounts C-1 and C-2, and Swiss Account C-4, all of which were held by BVI Corp C-1.

142.   TT-Cyprus assisted with the formation of BVI Corp C-1, managed the corporation, and was named as its director.

143.   Taxpayer C was the beneficial owner of BVI Corp C-1. Thus, Taxpayer C beneficially owned the accounts held in the name of BVI Corp C-1; however, by having TT-Cyprus form, manage, and serve as a director of BVI Corp C-1, Taxpayer-C was able to conceal his beneficial ownership of the corporation and the assets in its bank accounts.

144.   BVI Corp C-1's Cyprus accounts were opened after the entity was formed in 2007. No documentation was provided to Taxpayer C in connection with the opening of the Cyprus accounts. TT-Cyprus assisted in setting up the accounts and corresponded with Taxpayer C about the account openings. Deposits and withdrawals were requested by telephone or email, always confirmed by telephone, and done through wire transfers. From time to time, TT-Cyprus informed Taxpayer C of the status of the accounts, which were mostly dormant. In preparation for his 2014 voluntary disclosure submission, Taxpayer C received statements from TT-Cyprus. However, no statements had been issued earlier and Taxpayer C retained no documents. Later, in 2014, TT-Cyprus helped Taxpayer C close the accounts.

145.   BVI Corp C-1 opened its Swiss account in 2010. TT-Cyprus assisted the bank manager in opening this account. From time to time, the bank manager communicated with TT-Cyprus regarding the account. The bank manager occasionally provided Taxpayer C with account statements in paper, but Taxpayer C did not retain them. Taxpayer C used the bank's internet portal to check account balances. Deposits into BVI Corp C-1's Swiss account included transfers from Taxpayer C's personal account at the same bank. Taxpayer C requested these transfers via email and confirmed them by telephone. Deposits also included proceeds from the sale of stock deposited into the Swiss account directly by a third party. At the time of Taxpayer C's 2014 disclosure submission, this account was still open.

146.   During the disclosure period, Taxpayer C closed 15 of the 40 accounts held in his own name. Once closed, most of the account balances were transferred from the accounts that had been held in his name into BVI Corp C-1's bank accounts. For example, a Swiss account held by Taxpayer C in his own name at the same bank as BVI Corp C-1's Swiss Account C-4 was closed in 2014 and the securities and cash were moved from this personal account to BVI Corp C-1's Swiss Account C-4. Another account at a different Swiss bank was closed in 2014, and shares from this account were transferred to BVI Corp C-1's Swiss Account C-4.

147.    Based on my experience, I know that Switzerland, Cyprus, and the BVI are the type of no-tax, low-tax, or financial secrecy jurisdictions that U.S. taxpayers seek when attempting to conceal their beneficial ownership of entities or accounts to evade U.S. internal revenue laws.

148.    By forming an offshore corporation and communicating with the foreign banks through intermediaries with the help of the TT-Group, Taxpayer C was able to conceal his beneficial ownership of the accounts opened by BVI Corp C-1.

149.    Despite being required to do so, Taxpayer C did not report the existence of his offshore accounts and BVI entity, or income related to the offshore accounts, until he made a voluntary disclosure in 2014. Taxpayer C did not file all required FBARs for the years covered by the disclosure period until after he submitted his voluntary disclosure.

150.    TT-Group entities maintained information not readily available from other sources that would have allowed the IRS to identify Taxpayer C, and his tax non-compliance, prior to his voluntary disclosure.

### d. *Taxpayer D*

151.    Taxpayer D is a U.S. citizen and has a U.S. passport. At the time of her disclosure submission in 2014, Taxpayer D was living in Switzerland and listed her occupation as an author. During the disclosure period, which covered 2005 to 2012,

Taxpayer D had a financial interest in eleven offshore accounts: eight in Switzerland, two in Italy, and one in the United Kingdom. Four of the accounts were Swiss accounts opened in the name of an entity, rather than in the name of the taxpayer. The funds in the foreign accounts were attributable to Taxpayer D's (taxable) earnings as an author and (taxable) investment returns on those funds.

152.   Based on the disclosure submission, Taxpayer D used the services of a TT-Group entity (likely TCS-Switzerland) to form and maintain the offshore arrangement depicted below:



153.   The TT-Group entity facilitated the formation of BVI Corps D-1 and D-2. Both entities were BVI corporations that were wholly owned by Taxpayer D. Thus, Taxpayer D is the beneficial owner of these foreign corporations. However, the two BVI corporations were managed by a Swiss lawyer on behalf of Taxpayer D.

154.    Taxpayer D opened two Swiss accounts in the names of BVI Corps D-1 and D-2. Swiss Account D-1 was closed in 2009. Swiss Account D-2 was still open as of the date of Taxpayer D's 2014 voluntary disclosure submission.

155.    BVI Corp D-1 was no longer in existence as of the date of the voluntary disclosure submission. BVI Corp D-2 was in existence as of the date of the disclosure submission.

156.    Taxpayer D was a walk-in client of the Swiss bank and did not correspond with a designated bank representative consistently. Taxpayer D did not retain bank records for either entity account. For both accounts, deposits and withdrawals were made in person and were in the form of cash and wire transfers.

157.    By creating offshore corporations (with the help of a TT-Group entity) and opening foreign accounts in their names, rather than her own, and by limiting interactions with the bank to those that occurred in person, Taxpayer D was able to conceal her beneficial ownership of Swiss Accounts D-1 and D-2.

158.    Despite being required to do so, Taxpayer D did not report the existence of her offshore accounts and BVI entities, or income related to the accounts, until she made a voluntary disclosure in 2014. Taxpayer D did not file all requisite FBARs for the years covered by the disclosure period.

159.   TT-Group entities maintained information not readily available from other sources that would have allowed the IRS to identify Taxpayer D, and her tax non-compliance, prior to her voluntary disclosure.

### e.   *Taxpayer E*

160.   Taxpayer E and his spouse are U.S. citizens and have U.S. passports. Taxpayer E is also a Canadian citizen. At the time of their disclosure submission in 2011, both were living in the United States and listed their occupations as manager and instructor, respectively. During the disclosure period, which covered 2003 to 2010, Taxpayer E had a financial interest in two foreign accounts. BVI Account E-1 was opened in 1997 or 1998 in the BVI while Taxpayer E and his spouse vacationed there. A private bank assisted in opening BVI Account E-1 and advised that the account should be held through an entity for asset protection purposes. On that advice, BVI Account E-1 was opened in the name of a BVI International Business Corporation (BVI IBC E-1). Taxpayer E and his spouse are the beneficial owners of BVI Account E-1 and BVI IBC E-1.

161.   The bank created BVI IBC E-1 for Taxpayer E and his spouse and managed BVI Account E-1. Taxpayer E and his spouse had minimal contact with the bank regarding BVI Account E-1, and mainly communicated through email with bank representatives. According to their disclosure submission, the purpose for establishing this offshore account was for asset protection and estate planning. The

72

source of the funds was (taxable) income earned by Taxpayer E while living in Canada from 1989 to 2001.

162.   According to the disclosure submission, Taxpayer E and spouse went on to use the services of TT-BVI to modify and maintain the offshore arrangement



depicted below:

163.   At some point following the creation of BVI Account E-1 and BVI IBC E-1, the bank transferred management of BVI Account E-1 to TT-BVI.

164.   The funds were then held in an account in the Channel Islands (Channel Islands Account) with the same private bank. The private bank subsequently advised TT-BVI that it would no longer hold accounts and, in April 2009, TT-BVI transferred the funds in the Channel Islands Account to a bank in the BVI (BVI Account E-2), which TT-BVI also managed.

165.    Per the disclosure, Taxpayer E and his spouse contacted the BVI bank about BVI Account E-2 through TT-BVI, rather than making contact themselves. This made it more difficult to link them to the account.

166.    Despite being required to do so, Taxpayer E and his spouse did not report the existence of their offshore accounts and BVI IBC, or income related to the offshore accounts, until they made a voluntary disclosure in 2011. Although Taxpayer E and his spouse did file FBARs listing their personal foreign accounts before their voluntary disclosure submission, these FBARs did not list their entity accounts for the years covered by the disclosure period. The reporting of the personal accounts on FBARs, but not the entity accounts, evidences the use of entities to conceal their true ownership.

167.    TT-Group entities maintained information not readily available from other sources that would have allowed the IRS to identify Taxpayer E, and his tax non-compliance, prior to his voluntary disclosure.

ii.    *Examples from the Streamlined Filing Compliance Procedures Program*

168.    The OVDP disclosures discussed above are evidence of tax noncompliance by U.S. taxpayers who used the services of the TT-Group to facilitate violations of the internal revenue laws before 2014. Through my own research, I know that U.S. taxpayers who used the services of the TT-Group continued to engage in tax noncompliance after 2014. My knowledge is based on a review of

74

FBARs filed in connection with the IRS's Streamlined Filing Compliance Procedures program ("streamlined procedures"). The streamlined procedures were offered beginning on September 1, 2012, and have been expanded and modified since then. These procedures are available only to individual U.S. taxpayers (residing inside and outside the United States), and their estates, who must certify that their failure to report foreign financial assets did not result from willful conduct on their part and pay all tax due in respect of those assets.

169. I learned from research of FinCEN's FBAR database that U.S. taxpayers filed at least 45 FBARs from January 1, 2014, through December 31, 2023, as part of their participation in IRS's streamlined procedures program that included the word "Trident." Because these FBARs were filed as part of this disclosure program, they were either delinquent (i.e., not timely filed) or amended after the fact to correct inaccurate data or to include omitted information. In addition to filing FBARs, taxpayers who participated in the streamlined procedures program were also required to file amended or delinquent income tax returns and report income earned on their foreign financial assets. Thus, taxpayers who participated in this program likely failed to report income earned on their foreign financial assets, failed to file the requisite international information returns (e.g., Forms 3520 and 3520-A for foreign trusts), and failed to timely file or file complete and accurate

FBARs, and only became compliant through their participation in the streamlined procedures program.

170.    Of those 45 FBARs filed through the streamlined procedures program, 16 (covering calendar years 2014-2018 and 2020) reported offshore entities with offshore accounts listing TT-BVI's address as the "Owner Address." Some of those FBARs also reported TT-BVI's name in the "Owner Address" field. As explained above, taxpayers commonly list the addresses of offshore service providers or management companies for their beneficially owned foreign entities to further conceal their ownership of the entities and their foreign accounts. Using the address of an offshore service or management company for a taxpayer's foreign entity is thus often an indication that such companies are providing services to the taxpayer, such as managing their entity and offshore accounts. It may also be an indication that a "hold mail" instruction is in effect, so information is not sent to the taxpayer's U.S. address.

171.    Some of these FBARs reported that the filer had signature authority but no financial interest in an entity's offshore accounts, even when it appeared they were the true owner of the entity and its accounts. As an example, one FBAR filer reported thirteen offshore accounts in the name of a foreign entity for each of three years, indicating they had signature authority over the accounts but no financial interest, yet listed their title as "nominal shareholder." This filer listed TT-BVI's

address in the "Owner Address" field on their FBARs. Records summonsed through this action would provide further information about the true beneficial ownership of foreign entities by U.S. persons that is not readily available from other sources.

## V. The Requirements for a John Doe Summons Are Met for Each Summonsed Entity

172.  A John Doe summons may be served only after a court concludes that the Secretary of the Treasury has established that (1) the summons relates to the investigation of a particular person or ascertainable group or class of persons; (2) there is a reasonable basis for believing that such person or group or class of persons may fail or have failed to comply with any provision of any internal revenue law; and (3) the information sought is not readily available from other sources. Additionally, the information sought must be narrowly tailored to assist the IRS in investigating the unknown members of the John Doe class for their failure (or potential failure) to comply with the internal revenue laws.[52] These requirements are met for each summonsed entity in this proceeding, as explained in more detail below.

---

[52] On July 1, 2019, Congress enacted the Taxpayer First Act, which added a provision to 26 U.S.C. § 7609(f) requiring that John Doe summonses can be issued only if "the information sought to be obtained is narrowly tailored to information that pertains to the failure (or potential failure) of the [John Doe class] to comply with [the Internal Revenue Code]." This provision applies to summonses served more than 45 days after the statute's enactment. As explained in Section V-D-i through iii of this Declaration, each of the categories of documents requested by the proposed summonses are narrowly tailored to assist the IRS in investigating the unknown members of the John Doe class for their failure (or potential failure) to comply with the internal revenue laws, specifically 26 U.S.C. § 61.

## A. The Summonses Describe a Particular Person or Ascertainable Class of Persons

173.   The proposed John Doe summonses seek information about U.S. taxpayers who, at any time from 2014 to 2023, used the services of the TT-Group (including its predecessors, subsidiaries, and associates), to establish, maintain, operate, or control any foreign financial account or other foreign asset; any foreign corporation, company, trust, foundation or other legal entity; or any foreign or domestic financial account or other asset in the name of such foreign entity.[53]

174.   This class of persons is ascertainable since the persons in the class are particularized from the general public by being (1) United States persons; (2) who used the services of the TT-Group; (3) during the subject years; (4) to establish, maintain, operate, or control foreign financial accounts or other foreign assets, foreign entities, and/or financial accounts or assets (foreign or domestic) in the name of a foreign entity. This is a specific group: anyone who does not meet all four of these characteristics is not included in the class.

---

[53] The summons requests use a U.S. address or phone number as indicia of an individual's status as a U.S. taxpayer. Specifically, the summonses request documents related to clients who are U.S. citizens or residents, as well as those clients who have a U.S. address or phone number. *See* Exhibits A, B, and C.

### B. The Internal Revenue Service Has Reason to Believe Members of the John Doe Class May Have Failed to Comply with the Internal Revenue Laws

175. Based on information available to the IRS, the persons in the John Doe class may have failed to report the existence of foreign financial accounts and foreign entities under their control that they were required to report, failed to report income that they were required to report, evaded income taxes, or otherwise violated United States internal revenue laws.

176. As discussed above, many of the services that the TT-Group provides to its U.S. clients, as described at length on its websites and summarized above, are the kinds of activities that, in the IRS's experience, promote or facilitate offshore tax evasion. These services include establishing offshore accounts; establishing offshore structures, including offshore foundations and anonymous corporations managed by nominee officers and secretly owned through bearer shares or by nominee shareholders; concealing beneficial ownership in accounts and other assets in foreign jurisdictions with strong financial secrecy laws and practices; and using TT-Group entities' addresses for registration and mail purposes.

177. Based on my experience with the IRS's Offshore Compliance Initiatives Program, persons who hold undisclosed foreign accounts, foreign entities, or other foreign structures often do so to impermissibly conceal from the IRS the existence of such accounts, entities, or structures and their associated income.

178.    The information obtained by the IRS and discussed in this declaration suggests that many of the still-unknown U.S. persons who used the services of the TT-Group have violated the internal revenue laws because they have not reported their offshore accounts or entities, or the income associated with these structures and arrangements.

179.    In the IRS's experience, there is a direct correlation between third-party reporting of taxpayer income and taxpayers' voluntary self-reporting of the same income. That is, when a third-party payer is not required to, or fails to, report to the IRS income it pays to a taxpayer, the taxpayer-recipient is far less likely to report the income on his or her own income tax returns. IRS "tax gap" studies consistently show that compliance with internal revenue laws through self-reporting is far higher when third-party information reporting is mandated.[54] According to an October 2023 Congressional Research Service report, the IRS estimated that "underreported tax liability in 2021 was $167 billion for income subject to little or no information reporting . . . but only $9 billion for income subject to substantial reporting and withholding."[55] Because income in offshore accounts is subject to little or no information reporting or withholding requirements, taxpayers are much more likely

---

[54] IRS, Publication 5869, *Federal Tax Compliance Research: Tax Gap Projections for Tax Years 2020 and 2021* at 5 (rev. Oct. 2023), https://perma.cc/UE5H-U4P8.
[55] Cong. Res. Serv., *Federal Tax Gap: Size, Contributing Factors, and the Debate over Reducing It* at 2 (updated Oct. 30, 2023), https://perma.cc/C65V-TCH8.

to conceal the accounts' existence, and avoid paying required taxes on income earned in them. On the other hand, taxpayers are much less able to conceal and avoid paying taxes on assets and income that are subject to third-party reporting requirements such as interest income earned on funds held in domestic bank accounts. That is because financial institutions must report such interest income to the IRS on a Form 1099-INT, regardless of whether the recipients choose to self-report it on their own tax returns. Offshore income is thus easier—and in my experience significantly more likely—to be underreported than income earned or held domestically.

180. Such analysis further supports the IRS's belief that U.S. taxpayers with undisclosed offshore activities facilitated by the TT-Group may not be complying with the internal revenue laws requiring them to report income earned on their foreign accounts and the existence of their offshore assets. Many of the still-unknown U.S. persons doing business with the TT-Group have likely relied on the lack of third-party reporting when they failed to disclose their foreign accounts, foreign entities, or other foreign structures, and associated income, with the expectation that the IRS would not discover them.

181. In short, the IRS has reason to believe that individuals whose information is sought by these summonses have used the TT-Group's services to

facilitate noncompliance with the internal revenue laws. *See, e.g.*, *supra* Section IV-B and IV-C.

### C. The Requested Information Is Not Readily Available from Other Sources

182.    Based on the above information, the IRS has concluded that U.S. taxpayers in the John Doe class here may be failing to comply with internal revenue laws governing their obligations to report and pay tax on their worldwide income, to disclose all of their interests in foreign financial accounts, and to file required annual reports of such foreign financial accounts and offshore entities. Because the IRS does not know the identities of the members of the John Doe class, it cannot yet examine these U.S. taxpayers' income tax returns to determine whether they violated the internal revenue laws by failing to report their income held in offshore accounts and the existence of their offshore entities.

183.    To my knowledge, and based on my training and experience, the only repositories of the information sought by the proposed summonses that are readily available to the IRS are the summonsed entities in the three coordinated petitions being served as part of this investigation: Nevis Services, FedEx, DHL, UPS, Federal Reserve-NY, Clearing House, HSBC Bank USA, BNY Mellon, Wells Fargo, Citibank, UBS, Bank of America, and Deutsche Bank in the Southern District of New York; TT-USA, TCS-USA, and TFS-USA in this Court; and TTC-SD in the District of South Dakota. Persons in the John Doe class may have filed federal

income tax returns, but their identities are unknown, and an inspection of a particular taxpayer's return alone is not likely to reveal understatements or misstatements of income resulting from transactions concealed through the use of TT-Group enabled offshore accounts and entities.[56] The information sought by the IRS here is not readily available from sources other than those entities named in the requested John Doe summonses. In light of the above, the records sought by the John Doe summonses are not otherwise reasonably and timely available to the IRS.

### D. The Information Sought from Each Summonsed Entity Is Narrowly Tailored

184.    The proposed summonses are narrowly tailored to assist the IRS in identifying the unknown members of the John Doe class and investigating their potential failure to comply with the internal revenue laws, specifically 26 U.S.C. § 61, which requires the reporting of "all income from whatever source derived."

185.    The summonsed records will provide the IRS with information necessary to identify U.S. taxpayers who used the services of TT-Group entities to establish and maintain offshore entities and structures, including offshore bank accounts, and to conceal their ownership of other foreign assets, and who in doing so violated U.S. internal revenue laws.

---

[56] As noted in Section III-B-vii, paragraph 51, offshore tax evasion went almost entirely undetected in random audits carried out from 2006 to 2013.

186. The requests are directed at three categories: (1) identity information; (2) transaction information; and (3) beneficial ownership and control information.

### i. *Identity Information*

187. Certain requests are directed at adequately identifying the John Doe class members so that transactional and account data can reasonably be associated with particular persons. One key to determining whether there has been tax compliance is establishing, without question, the TT-Group client's identity by matching up summonsed records with those in the IRS's own computer systems. This means linking a particular TT-Group client to a particular name and taxpayer identification number in the IRS's internal databases. This is required because the IRS cannot begin an examination of a taxpayer without first positively identifying that taxpayer. To do so, the IRS employs several methods, including matching identifying information from external sources with IRS internal sources and databases.

188. Basic information such as name, address, date of birth, and taxpayer identification number goes a long way in establishing the identity of a taxpayer but, in my experience, particularly where abusive offshore arrangements are involved, that information is not always sufficient. It is not uncommon for taxpayers to use aliases, false addresses or addresses of others such as family members or service providers (domestic and foreign), post office boxes, fictitious or nominee entity

names, or other means to disguise their true identities. That may make basic information such as name, address, date of birth, and taxpayer identification number insufficient to fully identify tax evaders. Also, service providers such as TT-Group may not always have all categories of basic information discussed above because certain items may be missing (such as a date of birth where an entity name is used), incomplete, or have been falsified.

189.   The IRS's requests for identity information are designed to ensure that it receives identifying information regardless of how the summonsed party categorizes or defines that information. In other words, these requests are written to ensure that a response will include the information the IRS seeks, regardless of what it is called or how it is stored.

190.   Key identity information includes the name of a U.S. taxpayer client; taxpayer identification number; date of birth; physical address(es); telephone number(s); and email address(es).

191.   IRS internal systems track each taxpayer's reported address and taxpayer identification number on their income tax returns. In situations where the IRS does not receive a taxpayer identification number as part of a summons response, or the person's name and taxpayer identification number do not initially match with the IRS's internal information, additional data such as date of birth,

address, telephone number, and email address can assist the IRS in linking information received through a summons to a specific taxpayer.

192.    Generally, the IRS strives to match three specific data points to positively link outside information to a particular taxpayer. Being able to reconcile multiple different pieces of identifying information against the IRS's internal records is necessary to verify a client's identity.

193.    The IRS also generally seeks documents that reflect changes in clients' identifying information over time. This is because the information in a current client profile as of the date an entity responds to the summons may not match the information in an IRS database. The information may have been changed since it was provided to the IRS, or a taxpayer may have multiple email addresses, phone numbers, or addresses, in which case the IRS systems will only have those that a taxpayer has reported to the IRS. The proposed summonses therefore request historical identity information during the summonsed period to increase the chances that the IRS will be able to successfully link client information to taxpayer records.

194.    The identity information sought in the summonses is thus narrowly tailored to that which the IRS reasonably believes will allow it to confirm TT-Group clients' identities and match them with IRS taxpayer information. Conversely, where the information does not match, the identity information sought in the summonses

86

will allow the IRS to conduct additional investigation to identify the correct taxpayer/client.

### ii.    *Transaction Information*

195.    Transaction information requests are directed at adequately identifying whether taxable events took place.

196.    Key transaction information includes documentation of the services that TT-Group provided for a client; documentation of the establishment of foreign financial accounts, entities, or merchant accounts; and documentation confirming the existence of accounts or entities or showing that accounts have closed, or that entities have been terminated, dissolved, or otherwise ceased to exist.

197.    For each foreign account, key transaction information also includes documentation of account activity, including statements, invoices, payment history, wire transaction information, and deposit slips. For each foreign entity, key transaction information includes records of entity formation, termination, or dissolution (if applicable), resolutions, records of assets transferred into or out of the entity, and records of ownership and any changes therein.

198.    This transaction information is necessary to determine whether reportable or taxable events have occurred. For example, taxpayers must report whether they hold any offshore accounts. Documentation showing that TT-Group clients opened foreign accounts is vital to determining whether they accurately

reported the existence of those accounts on their tax returns. Other statutory reporting requirements depend on the maximum balance in an account during each tax year, which the IRS cannot determine without reviewing account statements. To determine whether a taxable event has occurred, like the receipt of income, the IRS also needs information about transactions. Because many transactions involve multiple entities or accounts, the IRS needs sufficient information to be able to track the flow of money from its origin to its final destination. Otherwise, the IRS may only identify part of a transaction and be unable to determine definitively whether a taxable event occurred.

199. Transaction information is also necessary to determine whether taxpayers have reported their interests in foreign entities, as required. For example, entity formation documents will identify the first year that taxpayers were required to file information returns such as Forms 3520-A and 5471. And certificates of dissolution will identify the final year such information returns were required.

### iii.    *Beneficial Ownership Information*

200. Requests for information about beneficial ownership and control are aimed at identifying the true beneficial owners of relevant accounts and assets (i.e., the persons who ultimately control the assets) in the face of mechanisms designed to conceal this information. This is often the most difficult aspect for the IRS to

determine but is extremely important because it is the beneficial owner who is responsible for the tax consequences of the offshore arrangement.

201.   Formal corporate documents, as well as KYC files, can contain this information, which is why the IRS is requesting those documents. However, they do not always contain complete information, especially where taxpayers actively try to conceal their beneficial ownership of assets or entities.

202.   Historically, in investigating offshore tax noncompliance, the IRS has heavily relied on correspondence it obtains through John Doe summonses. Because offshore tax evasion often involves offshore entities and these entities are often controlled by nominees, corporate documents alone do not always reveal the true beneficial owners. To properly examine the tax liabilities of taxpayers operating offshore, the IRS needs to obtain correspondence to identify the true beneficial owners (that is, the individuals who made decisions, benefitted from the offshore funds, and are liable for reporting and paying tax on income).

203.   In addition to records of client communications, other documents sometimes reveal the true beneficial owners or controllers of entities when beneficial ownership is either not reported or is not accurately reported. These documents, which can indicate who has ultimate decision-making power, include signature cards, powers of attorney, written instructions or letters of wishes, bylaws, nominee

agreements, and "hold mail" instructions, among others, and are crucial in enabling the IRS to identify the true beneficial owners of each asset or entity.

204.   Beneficial ownership information is important because the beneficial owners are ultimately responsible for income tax reporting and payment. Identifying beneficial owners, who have often been intentionally obscured, is necessary to determine whether or not those persons have complied with the internal revenue laws. The IRS has narrowly tailored its requests for beneficial ownership information in this case to information that will enable it to identify the beneficial owners of offshore arrangements created or managed by the TT-Group, or allow it to pursue further investigations to uncover that identification.

205.   Information from the summonsed parties relating to all TT-Group entities, not only the U.S.-based ones, are relevant and necessary to this inquiry.

### E. Each Proposed Summons Recipient Is Likely to Have Information Responsive to the Narrowly Tailored Requests

206.   Below is a brief description of the types of information sought from the summonsed TT-Group entities. For the reasons explained above, these requests are narrowly tailored to allow the IRS to match TT-Group clients to taxpayers, evaluate whether reportable or taxable events occurred, and ensure that tax consequences are attributed to the correct person—the beneficial owner. The requested information is thus narrowly tailored to pertain to the failure or potential failure of class members to comply with internal revenue laws.

207.   The TT-Group structure is described in detail in Section IV-A above, with the roles of TT-USA, TCS-USA, and TFS-USA specified in paragraphs 66-70.

208.   Information available to the IRS indicates that the TT-Group collects information about its clients, including the class of U.S. taxpayer clients whose information is sought by the proposed John Doe summonses because they may fail or have failed to comply with the internal revenue laws, that is relevant to the IRS's investigation. The information is not readily available from other sources. The information collected by the TT-Group is required for TT-Group entities to provide services, to meet various due diligence and AML-Counter Terrorism Financing ("CTF") requirements, and to meet other statutory requirements in circumstances when a TT-Group entity serves as the registered agent, trustee, or officer of an entity.

209.   The TT-Group's website includes a *Global Privacy Notice* updated on April 15, 2024 (the "Privacy Notice"). *See* Exhibit 30. The Privacy Notice describes the types of information the TT-Group has collected about its clients, the purposes for collecting the information, parties with whom the TT-Group may share the information, and the measures taken to protect the security of the information. Section 1.3 of the Privacy Notice states that it applies broadly to "the interactions we have with individuals who deal with our Offices," and lists those offices in its Appendix A. TFS-USA and TCS-USA are both included in the Privacy Notice's Appendix A.

210.    According to sections 3.4 and 4.1 of the Privacy Notice, personal data refers to information that can be used to identify a natural person, and includes, but is not limited to, the following: contact information such as home or work address, telephone number, and email address; pay records, bank account details, and tax information; records of the business transactions conducted with the TT-Group; date of birth; marital/civil partnership status; source of wealth; beneficial ownership of assets; and business activities. Many of these categories of information are the same ones sought by the IRS in its investigation, including identity information (contact information, date of birth), transaction information (bank account records, transaction records), and beneficial ownership information (beneficial ownership of assets, source of wealth). As explained above, these records are reasonably likely to provide information not readily available from other sources about a class of U.S. beneficial owners of otherwise hidden assets who may fail or have failed to comply with the internal revenue laws.

211.    While TT-Group entities accept invoice payments by check or wire transfer, as described in detail in paragraphs 86-87 and 116-117 above, some TT-Group entities such as TT-BVI, TT-Panama, TT-USVI, and Morning Star/Meridian Trust (now TT-Nevis) allow invoice payments via credit card. On these TT-Group entities' invoice payment webpages, cardholders are directed to "click on the button below to make a payment" to begin the payment process. Cardholders are also

alerted that they need to provide the invoice number and the entity name to which the invoice relates in order to process the payment. *See* Exhibits 31, 32, 33, and 34 Invoice payments for services related to an entity are clear evidence of the TT-Group's involvement in establishing, maintaining, operating, or controlling offshore entities for its clients. After clicking the link to pay the invoice, cardholders are directed to a page where they can enter their billing information, which includes identity information such as first and last name, company name, country, address (city, state/province, zip code/postal code), phone number, fax number, email address; transaction information such as invoice reference; beneficial ownership information such as entity name; and an "extra message" box for other information. *See* Exhibits 35, 36, 37, and 38. Although not on this billing information input screen, other transaction information includes the amount of the payment and the client's credit card number. This input screen has a drop-down selection for country and state/province. When this page is first accessed, the country name defaults to the United States, an indication that the TT-Group promotes their services to U.S. taxpayers. *See* Exhibits 35, 36, 37, and 38. The billing information that is entered to process invoice payments for TT-Group clients paying their invoices via credit card will be a rich source of leads to identify U.S. clients of the TT-Group. Not only will the information captured identify clients with a U.S. connection, but it will also identify the name of the U.S. client's offshore entity, since the entity name is

required to process the payment, thus linking the beneficial owner to the entity. Accordingly, with this billing information, the TT-Group will be able to readily identify which of its clients fall within the John Doe class.

212.    While the proposed summonses are only addressed to TT-USA, TCS-USA, and TFS-USA, the information requested includes all records available to those entities, including records that may have originated with a different TT-Group entity but that can be accessed by the summonsed entities electronically or otherwise without request to a foreign entity.

213.    The TT-Group website currently includes a document titled *Terms and Conditions of Business* (updated on December 21, 2023). Exhibit 39. This document includes a Section 12.2.5 on confidentiality, which specifies that the TT-Group shall use all reasonable endeavors to keep client information confidential, but has exceptions for instances when disclosure is required upon the order of any court or other governmental, tax, supervising or regulatory body (whether or not having the force of law).

214.    The Privacy Notice, referenced in paragraph 209, above, provides for the transfer of client information between TT-Group entities. Section 6.2 of the notice specifies that the TT-Group may share client information between its offices, including between members of the TT-Group, or with third parties. Section 6.3 of

the notice states that client information in the TT-Group's possession may be transferred among jurisdictions.

215.   The Privacy Notice also informs TT-Group clients that their information may be used and processed to comply with court, tribunal, or other judicial orders, including but not limited to production orders and discovery or disclosures orders. The notice states that the information may also be used and processed for compliance with a legal obligation to which the TT-Group is subject. Section 6.1 of the notice, under the subheading "Sharing Your Information with Others," alerts clients that the TT-Group may share any client information in its possession with others to comply with the laws and regulations of the jurisdictions of client entities. Section 6.5 of the notice alerts clients that certain countries may have differing laws relating to the degree of confidentiality afforded to the information they hold, and that such information can become subject to the laws and disclosure requirements of such countries, including disclosure to governmental bodies, regulatory agencies, and private persons, as a result of applicable governmental or regulatory inquiry, court order or other similar process. Section 6.6 alerts clients that many jurisdictions have agreements with other countries providing for the exchange of information for law enforcement, tax, and other purposes. And Section 6.8 describes the potential recipients, or categories of recipients, of client

information, including revenue services or tax authorities, if so entitled under applicable law and regulations, and international reporting obligations.

216.   The TT-Group's business and privacy policies, therefore, show that the TT-Group shares information across its global entities. This investigation is focused on identifying U.S. taxpayers who failed to report and pay tax on offshore assets, so records that originated with offshore TT-Group entities are not readily available from other sources and are narrowly tailored to further the IRS's ability to confirm taxpayer identities, determine whether offshore arrangements gave rise to reporting or tax requirements, and establish which taxpayers are the beneficial owners of offshore entities or assets.

217.   Evidence I have reviewed of TT-Group practices shows that information-sharing takes place in practice as well, which provides a further basis to expect that the requested records are accessible to, are in the possession, custody, and control of, and can be produced by the summonsed entities. In reviewing information available to the IRS pertaining to clients of the TT-Group, I learned that the TT-Group maintains correspondence and other records in its offices and shares client records with office locations worldwide, as needed. Documents maintained by TT-Group entities of relevance to the proposed summonses include: Articles of Incorporation, Articles of Association; Certificates of Good Standing, Certificates of Incorporation, Certificates of Incumbency (identifying entity names,

incorporation dates, directors, shareholders); Share Certificates; Share Transfer

Forms; Registers of Members; Registers of Directors and Officers; correspondence

between the TT-Group and clients; utility billing statements for address verification;

Letters of Instruction; Letters of Wishes; and minutes.

218.   In a series of decisions finding that TCS-USA had "control" over

documents held by a TT-Group entity in the Bahamas, the United States District

Court for the Northern District of Georgia and the United States Court of Appeals

for the Eleventh Circuit examined the business practices and functions of United

States-based TT-Group entities vis-à-vis their foreign counterparts. In one decision,

the district court explained that:

> From a client's perspective, it is apparent that Trident Group is one seamless
> organization that simply has various offices for convenience sake. That is why
> one contract applies to all of the offices, regardless of their technical name or
> physical location.
>
> [TCS-USA employee Britt-Marie] Holden admitted that the Trident Group
> affiliates frequently pass information and documents back and forth—that is
> the only way that they are able to conduct their business. The Atlanta office
> would be useless if it could not serve as a conduit for information and
> documents to the production offices and vice versa.

*In re Application of Sergeeva*, No. 1:13-CV-3437-LMM-RGV, 2015 WL 12862925,

at *7–8 (N.D. Ga. Oct. 13, 2015).

219.   The Eleventh Circuit found that TCS-USA had control over documents

held by a TT-Group entity in the Bahamas, and was therefore required to produce

those documents. *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1201 (11th Cir.

2016). Here, the proposed summonses to TT-Group entities do not require them to produce all documents within their control, which would include documents held by foreign affiliates but only accessible to the United States entities upon request; rather, the IRS is only requesting documents that the United States-based TT-Group entities can access without needing to make specific requests to foreign entities. The business policies and practices of the TT-Group indicate that this category of documents is likely to include a large number of documents that originated with foreign TT-Group entities. The Court's discussion in *Sergeeva* also shows the extent to which the United States-based TT-Group entities are likely to already have information and documents that may have originated with foreign offices, but are now held by the United States offices.

220.   As discussed in Section IV-B, above, the TT-Group offers a variety of services that help its clients conceal their ownership of offshore entities and accounts, such as company formation, registered agent, registered office, director, nominee shareholder, and bank signatories.

221.   The requested information also includes information about domestic entities the TT-Group has helped U.S. taxpayers to create or maintain. This is because the IRS has learned from experience that service providers and promoters of abusive offshore arrangements often help U.S. taxpayers create domestic entities as well. In many instances, domestic entities are established in combination with

offshore structures and arrangements, adding multiple layers to an arrangement to conceal a client's beneficial ownership and to escape taxation through distributions to other layered entities beneficially owned by the taxpayer. As explained above, when determining whether a taxable event has occurred, the IRS needs to be able to trace all steps of the transaction to make an accurate determination.

222.   Throughout this declaration, I have shown why the summonsed entities are likely to have information relevant in identifying U.S. persons who used the TT-Group's services to create and operate offshore structures and financial accounts in violation of the internal revenue laws (including those requiring reporting and paying taxes on offshore assets). The information sought by the summons, as laid out in Exhibits A, B, and C, consists of identity information (Requests 1, 2, 4(a), 7(u), 8(d), and 8(e)); transaction information (Requests 4(b), 4(d), 5, 7(d), 7(m), 7(q)-(t), 8(f)-(g), and 8(j)-(l)); and beneficial ownership information (Requests 2, 3, 4(c), 6, 7, and 8) that is narrowly tailored to allow the IRS to investigate whether U.S. taxpayers have failed to comply with internal revenue laws.

223.   The information sought is narrowly tailored because it only seeks what is required to match TT-Group clients to U.S. taxpayers, evaluate whether reportable or taxable events occurred with respect to those taxpayers, and ensure that the IRS can identify the beneficial owners to whom any tax consequences should be attributed.

224.    As described above, the IRS believes that TT-Group entities located in the United States have ready access to and can produce many of the records associated with overseas TT-Group entities that are not readily available from other sources. Any requested records that the summonsed entities have access to are included in the summons. However, the IRS is not requesting the TT-Group entities to produce records that they would need to request access to from a foreign affiliate (even though under *Sergeeva* such records are under the U.S. entities' "control"). The IRS is summonsing all TT-Group entities in the United States in the event that each entity has access to different information. However, to the extent that multiple summonsed entities within the TT-Group have access to the same data, the IRS is not seeking multiple productions of that data.

## VI.    **Conclusion**

225.    Based upon the foregoing, I believe that the information sought in the proposed John Doe summonses to be issued to TT-USA, TCS-USA, and TFS-USA will allow the IRS to identify U.S. taxpayers who may have failed to comply with their obligation to report, and to pay U.S. tax on income earned with respect to, financial accounts and entities established, maintained, operated, or controlled by or through the TT-Group at any time during the years ended December 31, 2014,

through December 31, 2023, and such information is not readily available from other

sources.[57]

* * *

---

[57] Petitions for authorization to issue John Doe summonses to TTC-SD, Nevis Services, FedEx, DHL, UPS, Federal Reserve-NY, Clearing House, HSBC Bank USA, BNY Mellon, Wells Fargo, Citibank, UBS, Bank of America, and Deutsche Bank are being simultaneously filed in other judicial districts.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this _16th_ day of _December_ 2024.

RANDY HOOCZKO
Internal Revenue Agent
Internal Revenue Service

## APPENDIX A: SUMMARY OF TT-GROUP FOREIGN ENTITIES[58]

These abbreviations, as well as the "TT-Group" abbreviation, have been assigned by the IRS for ease of use in this filing. The "Tax Haven Jurisdiction?" column indicates whether the country of location was identified as a tax haven in the Congressional Research Service's 2022 update on *Tax Havens: International Tax Avoidance and Evasion*.[59]

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust Company (Anguilla) Ltd. | Anguilla (British West Indies) | TT-Anguilla | Fiduciary and corporate services for corporate and private clients.[60] | Yes |
| Trident Corporate Services (Bahamas) Limited | Bahamas | TCS-Bahamas | Bahamian International Business Company ("IBC") formation and administration, directorship and nominee | Yes |

[58] This list includes all entities currently identified on the Trident Trust website (*see* Exhibit 30, Trident Trust Group Global Privacy Notice, Appendices A, B, and C (last updated April 15, 2024)), all entities with office locations listed on the Trident Trust website, entities listed on the Trident Trust website as of August 19, 2019 (see Exhibit 40, Worldwide Directory as of 2019), and additional entities known to the IRS to be part of the TT-Group collective. The entities only offering marine services are unlikely to have any information relevant to this John Doe summons, but are included here for completeness.

[59] U.S. Congressional Research Service, *Tax Havens: International Tax Avoidance and Evasion*, R40623 (updated Jan. 2022), *supra* footnote 2.

[60] Trident Trust, *Anguilla*, https://perma.cc/UT3T-U5AU.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust Company (Bahamas) Limited | Bahamas | TT-Bahamas | shareholder services, establishment of foundations, and financial statement preparation.[61] TCS-Bahamas is no longer identified on Trident's website but was included in the TT-Group's 2019 Worldwide Directory.[62] | Yes |
| Trident Corporate Services (Barbados) Limited | Barbados | TCS-Barbados | Incorporation and administration of trusts and corporations in Barbados, director and shareholder services, access to Barbados's extensive international tax treaty network.[63] | Yes |
| Trident Corporate Services Brazil Ltda | Brazil | TCS-Brazil | Implementation of global investment, asset protection, tax, and inheritance planning, as well as the establishment and administration of international fund structures.[64] | No |

---

[61] Trident Trust, *Bahamas*, https://perma.cc/DDW8-4KEM.
[62] Exhibit 40, TT-Group Worldwide Directory dated 2019.
[63] Trident Trust, *Barbados*, https://perma.cc/7GNV-UCSE.
[64] Trident Trust, *Brazil*, https://perma.cc/EWV8-9Q75.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust Company (BVI) Limited | British Virgin Islands (BVI) | TT-BVI | Trust and managed company services; acts as a registered agent for a significant portion of the overall number of active companies in the BVI register, according to its website.[65] The BVI office also offers captive insurance company management services (through TIM-BVI), marine services, and is licensed as a fund administrator. | Yes |
| Trident Fund Services (BVI) Limited | British Virgin Islands (BVI) | TFS-BVI | | Yes |
| Trident AR (BVI) Limited | British Virgin Islands (BVI) | TAR-BVI | | Yes |
| Trident Insurance Management (BVI) Ltd. | British Virgin Islands (BVI) | TIM-BVI | | Yes |

[65] Trident Trust, *British Virgin Islands*, https://perma.cc/Y85S-B34Y.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Integritas (Canada) Trustee Corporation Limited | Canada | Integritas-Canada | Formation and representation services for companies and limited partnerships; implementation of clients' international succession, asset protection, and business planning.[66] | No |
| TT Services (Canada) Limited | Canada | TT-Canada | | No |
| Trident Trust Company (Cayman) Limited | Cayman Islands | TT-Cayman | Corporate, trust, private equity, and mutual fund administration services; digital asset sector services.[67] | Yes |
| Trident Corporate Services (Shanghai) Co. Ltd. | China | TCS-China | Establishing and administering structures in all jurisdictions in which the TT-Group operates; acts as a Client Liaison Office for the TT-Group, providing a gateway to the Group's wide range of global services.[68] | No |

---

[66] Trident Trust, *Vancouver*, https://perma.cc/DC8Z-774E.

[67] Trident Trust, *Cayman Islands*, https://perma.cc/H2CK-FUZE.

[68] Trident Trust, *Shanghai*, https://perma.cc/BP3G-CJHA.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust Company (Cyprus) Limited | Cyprus | TT-Cyprus | Full range of services to Cyprus companies, funds, and trusts, as well as companies and trusts in other jurisdictions.[69] TT-Cyprus also assists with applications for permanent resident permits, which it advertises allow international investors access to Cyprus's corporate and tax regimes.[70] | Yes |
| Trident Trust Company (UAE) Limited | Dubai, United Arab Emirates | TT-UAE | Fund administration and private client services;[71] works with private clients, advisors, and other professional firms to establish wealth planning and asset protection structures.[72] | No |
| Trident Fund Services (DIFC) Limited | Dubai, United Arab Emirates | TFS-UAE | | No |

---

[69] Trident Trust, *Cyprus*, https://perma.cc/RGK9-VRB8.

[70] Trident Trust, *Key Facts: Cyprus Permanent Resident Permit*, https://perma.cc/V9KZ-WW4K.

[71] Trident Trust, *Our History*, https://perma.cc/S9KD-MFTZ.

[72] Trident Trust, *Dubai*, https://perma.cc/KHY5-K689.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust Company (Guernsey) Limited | Guernsey | TT-Guernsey | Corporate and fiduciary services; marine services.[73] | Yes |
| Trident Trust Marine Services Limited | Guernsey | TT-Marine-Guernsey | | Yes |
| Trident Corporate Services (Asia) Limited | Hong Kong | TCS-Hong Kong | Trust, corporate, and fund administration services. Trust services include the structuring of financial assets, operating businesses, property, and other real assets, and implementation of complex cross-border family wealth structuring solutions.[74] | Yes |
| Trident Fund Services (HK) Limited | Hong Kong | TFS-Hong Kong | | Yes |
| Trident Trust Company (HK) Limited | Hong Kong | TT-Hong Kong | | Yes |
| Trident Services (I.O.M.) Limited | Isle of Man | TS-Isle of Man | | Yes |

---

[73] Trident Trust, *Guernsey*, https://perma.cc/GK42-GMGS.
[74] Trident Trust, *Hong Kong*, https://perma.cc/F8VE-7K8Z.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust Company (I.O.M.) Limited | Isle of Man | TT-Isle of Man | Administers multi-jurisdictional trust and corporate arrangements.[75] | Yes |
| Trident Trust Company Limited | Jersey | TT-Jersey | Full range of corporate and fiduciary services.[76] | Yes |
| Trident Trust Company (Luxembourg) SA | Luxembourg | TT-Luxembourg | Assists with the establishment and administration of Luxembourg companies and alternative investment funds.[77] | Yes |
| Client Audit Services SA | Luxembourg | CAS-Luxembourg | | Yes |
| Trident Trust Company (Malta) Limited | Malta | TT-Malta | Full range of services to Malta companies, funds, trusts, and foundations, as well as liquidation services for local structures.[78] | Yes |
| Trident Corporate Services (Malta) Limited | Malta | TCS-Malta | | Yes |

---

[75] Trident Trust, *Isle of Man*, https://perma.cc/TPL9-25VY.

[76] Trident Trust, *Jersey*, https://perma.cc/QPD9-3NDN.

[77] Trident Trust, *Luxembourg*, https://perma.cc/6CNC-8SQQ.

[78] Trident Trust, *Malta*, https://perma.cc/Y8EQ-E2HA.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Fund Services (Malta) Limited | Malta | TFS-Malta | | Yes |
| Trident Trust Company (Mauritius) Ltd. | Mauritius | TT-Mauritius | Corporate and fund administration services to clients operating in 45 of the 55 countries in Africa.[79] | Yes |
| Trident Trust Marine Monaco | Monaco | TT-Marine-Monaco | Marine services, including vessel registration and administration, for luxury yachts and commercial shippers.[80] | Yes |
| Trident Trust Company (NZ) Ltd | New Zealand | TT-New Zealand | Corporate administration and fiduciary services to New Zealand companies and foreign trusts, as well as entities in other jurisdictions, including U.S. foreign grantor trusts.[81] | No |
| Trident Corporate Services (Panama) SA | Panama | TCS-Panama | Formation and administrative services for Panama companies and foundations, including providing company secretarial, | Yes |

---

[79] Trident Trust, *Mauritius*, https://perma.cc/3AKK-DN24.

[80] Trident Trust, *Monaco*, https://perma.cc/N6B9-MHR9.

[81] Trident Trust, *New Zealand*, https://perma.cc/NVQ9-R9JA.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust (Panama) SA | Panama | TT-Panama | accounting, and managed company services; also provides guidance on opening bank accounts in Panama.[82] TT-Panama is no longer identified on Trident's website but was included in the TT-Group's 2019 Worldwide Directory.[83] | Yes |
| TT & Asociados | Panama | TTA-Panama | Acts as the registered agent for all entities created through TCS-Panama. | Yes |
| Trident Trust Company (Nevis) Limited | Saint Kitts and Nevis | TT-Nevis | The TT-Group previously operated in Nevis via two wholly owned subsidiaries, Morning Star and Meridian. According to TT-Group's Nevis webpage accessed on March 22, 2024, Morning Star and Meridian have since merged into a new entity, TT-Nevis.[84] The website also | Yes |
| Morning Star Holdings Ltd. | Saint Kitts and Nevis | Morning Star (since merged into TT-Nevis) | | Yes |

---

[82] Trident Trust, *Panama*, https://perma.cc/QTV7-RT96.
[83] Exhibit 40, TT-Group Worldwide Directory dated 2019.
[84] Trident Trust, *Nevis*, https://perma.cc/Y87M-TWGC.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Meridian Trust Company Ltd. | Saint Kitts and Nevis | Meridian (since merged into TT-Nevis) | reflects that TT-Nevis acts as trustee of a significant number of Nevis trusts, and handles all aspects of formation, representation, trustee, and fiduciary services for a wide range of international clients. | Yes |
| Trident Trust Company (Seychelles) Limited | Seychelles | TT-Seychelles (no longer active) | No longer identified on Trident's website and appears to have closed, but was operating during most of the time period at issue in the proposed summonses, and was included in the TT-Group's 2019 Worldwide Directory.[85] | Yes |
| Trident Corporate Services (Singapore) Pte Limited | Singapore | TCS-Singapore | Full range of trust, corporate, and fund administration services, including accounting; FATCA/CRS reporting; establishment, and administration of foreign trusts; and the formation, management, and administration of Singapore and international companies. The Singapore office also acts as a Client Liaison Office for the TT-Group, assisting | Yes |
| Trident Shared Services (Singapore) Pte Limited | Singapore | TSS-Singapore | | Yes |

---

[85] Exhibit 40, TT-Group Worldwide Directory dated 2019.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust Company (Singapore) Pte Limited | Singapore | TT-Singapore | clients in accessing the Group's global services.[86] | Yes |
| Trident Corporate Services (Spain) SL | Spain | TCS-Spain | Establishment, re-domiciliation, and administration of Spanish companies, accounting, tax compliance and financial reporting services, company secretarial services, local directorship, registered office, and registered agent services.[87] | No |
| Integritas Services SA | Switzerland | Integritas-Switzerland (no longer active) | Swiss Trustee services; full range of trustee and trust administration services to financial institutions, family offices, professional advisors, and their clients.[88] | Yes |
| Trident Corporate Services AG | Switzerland | TCS-Switzerland | Assists clients in establishing and administering structures across a global | Yes |

---

[86] Trident Trust, *Singapore*, https://perma.cc/K2F2-BU9Y.

[87] Trident Trust, *Madrid*, https://perma.cc/V6GX-XHSZ.

[88] Trident Trust, *Geneva*, https://perma.cc/TLE3-7HMJ.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust (Switzerland) AG | Switzerland | TT-Switzerland | range of jurisdictions in which the TT-Group operates; acts as a Client Liaison Office for the TT-Group, providing a gateway to the Group's wide range of global services.[89] | Yes |
| Trident Company Services (UK) Limited | United Kingdom | TCS-UK | Corporate trustee services to clients from a range of jurisdictions; U.K. corporate, domiciliary, administrative, and accounting services to U.K. companies and limited liability partnerships; acts as Agent for Service of Process in the U.K.; provides document retrieval and legalization services; and acts as a liaison service for the incorporation and administration of companies worldwide.[90] | No |
| Trident Trust Company (UK) Limited | United Kingdom | TT-UK | | No |
| Trident Corporate Services (Uruguay) SA | Uruguay | TCS-Uruguay | Corporate and private client services, assisting with global investments, asset protection, and tax and wealth planning solutions.[91] | No |

---

[89] Trident Trust, *Zurich*, https://perma.cc/BU6Y-R79T.

[90] Trident Trust, *United Kingdom*, https://perma.cc/XT29-VMG5.

[91] Trident Trust, *Uruguay*, https://perma.cc/DP9T-WXS3.

| Trident Trust Entity Name | Location | Abbreviation Used in Declaration | Services Offered | Tax Haven Jurisdiction? |
|---|---|---|---|---|
| Trident Trust Company (VI) Limited[92] | U.S. Virgin Islands | TT-USVI | Company formation, administration, and statutory representation services for Foreign Sales Corporations; exempt company and exempt limited liability company formation, representation, and administration; provides local registered agents for foreign companies; document filing and retrieval services with various government departments.[93] | Yes |

---

[92] While the U.S. Virgin Islands is a territory of the United States, it maintains a separate tax code. *See* V.I. Code, Title 33 (Taxation and Finance). The U.S. Virgin Islands and the United States maintain "separate and distinct taxing authorities, and the revenue due the Virgin Islands is paid into its treasury." *Vitco, Inc. v. Gov't of Virgin Islands*, 560 F.2d 180, 181–82 (3d Cir. 1977). Thus, the IRS does not seek to summons TT-USVI for information about U.S. taxpayers.

[93] Trident Trust, *U.S. Virgin Islands*, https://perma.cc/GM26-VNLU.